LINDA M. ADAMS,               )
                                 )
    **Plaintiff,**              )
                                 )
    **vs.**                      )  **Cause No.  1:17-cv-2101-WTL-MJD**
                                 )
**UNIVERSITY OF INDIANAPOLIS,**  )
                                 )
    **Defendant.**            )

## ENTRY ON MOTION FOR SUMMARY JUDGMENT

This cause is before the Court on the Defendant's motion for summary judgment (Dkt. No. 55).  The motion is fully briefed and the Court, being duly advised, **GRANTS** the motion for the reasons set forth below.  Also before the Court is the Plaintiff's motion for leave to file a surreply (Dkt. No. 97); that motion is **DENIED**.

## I. MOTION TO FILE SURREPLY

The Plaintiff filed a motion for leave to file a surreply, asserting that she was entitled to do so because the Defendant's reply brief contained new legal arguments, new evidence, and new objections to evidence cited in the Plaintiff's response brief.  However, the Court did not consider any of the new evidence the Defendant attached to its reply brief, as it ultimately was not relevant to the Court's resolution of the instant motion.  The things the Plaintiff characterized as "objections to the admissibility of Ms. Adams' evidence," Dkt. No. 97 at 4, simply are not; they have nothing to do with admissibility of the evidence in question.  Nor do the "new arguments" to which the Plaintiff points justify a surreply, as each of them is simply a response by the Defendant to arguments made in the Plaintiff's response brief.  And in any event, the

Plaintiff's proposed surreply goes far beyond merely addressing the "new" evidence and arguments she identifies.

The Plaintiff was given a full and complete opportunity to demonstrate that the Defendant was not entitled to summary judgment; in fact, she sought and was granted an enlargement of the page limit to do so.  *See* Dkt. Nos. 61, 62.   Nothing in the Defendant's reply brief warrants the lengthy surreply the Plaintiff wishes to file.  Accordingly, the Plaintiff's motion for leave to file a surreply is denied, and the Court has not considered the proposed surreply or accompanying exhibits.

## II.  SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In ruling on a motion for summary judgment, the properly supported facts asserted by the non-moving party must be believed, and all reasonable inferences must be drawn in the non-movant's favor.  *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor.").  However, a party who bears the burden of proof on a particular issue may not rest on her pleadings, but must show what evidence she has that there is a genuine issue of material fact that requires trial.  *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003).  Of particular importance in this case, in which the parties have submitted a very large number of exhibits, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in search of evidence to defeat a motion for summary judgment."  *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).  Therefore, with regard to each of the Plaintiff's claims, the

Court has considered the evidence of record that the Plaintiff, as the non-moving party, points to in her brief as supporting her arguments with regard to that claim. *See Draper v. Martin*, 664 F.3d 1110, 1114 (7th Cir. 2011) ("It is not this court's responsibility to research and construct the parties' arguments."); *Burton v. Bd. of Regents of Univ. of Wisconsin Sys.*, 851 F.3d 690, 695 (7th Cir. 2017) ("'It is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered.'" (quoting *Liberles v. Cook Cty.*, 709 F.2d 1122, 1126 (7th Cir. 1983)).

## III. BACKGROUND

The relevant background facts of record, viewed in the light most favorable to the Plaintiff, as the non-moving party, are as follows. Additional facts are included in the Discussion section where relevant.

Plaintiff Linda Adams was hired by Defendant the University of Indianapolis ("UI") in 1998. She originally worked as a custodian, but was promoted to an administrative assistant position in 2001. Until 2014, she reported to Executive Director of the Physical Plant, Ken Piepenbrink. Piepenbrink consistently rated Adams' performance as "exceeds expectations" or "exceptional performance" on her performance reviews, and Piepenbrink testified that he found her overall performance to be outstanding.

Adams has several medical conditions that affect her work and personal activities. She has been diagnosed with TMJ, chronic causalgia,[1] and fibromyalgia. These conditions cause Adams to suffer pain, tingling, and throbbing in her left foot and leg; pain on the bottom of both

---

[1] Adams' brief states that she has "chronic neuroma," but the cited deposition testimony discusses "chronic causalgia." Dkt. No. 70-19 at 3.

feet; right hip pain; right face and jaw pain; tingling in her arms and hands; stabbing pain in her left elbow; and shoulder and neck pain. She also has had two foot surgeries. In 2011, she was given a permanent impairment rating of 5% relating to pain in her neck, shoulder, and lower back that was caused by a fall.

During Piepenbrink's supervision, Adams' "daily responsibilities included managing work orders from the campus community, processing invoices from suppliers and contractors, and keeping the entire department informed of campus issues from human resources to social activities and events." Dkt. No. 73 at 13. She also supervised student assistants who worked for the department.

In 2014, the University hired a new President and Piepenbrink retired. Koren Vitangeli, Vice President for Student and Campus Affairs and Dean of Students, became interim Director of the Physical Plant and Adams' supervisor.

In the fall of 2014, on the advice of her neurologist, Adams obtained a permanent handicap parking sticker. Adams asked Vitangeli to have an accessible parking space designated as a handicapped space in the parking lot nearest the Physical Plant where she worked. Vitangeli told Adams that Adams "needed to keep track of how often [she] could not find a handicapped parking spot, and then if she felt that was often enough, she would give me a parking spot over in the student parking, which was a building away" from the Physical Plant. Dkt. No. 55-1 at 8-9.[2]

---

[2] Adams cites to "DOE 217 62:16–64:8" for the following factual assertion: "After speaking to an EEOC representative who provided [sic] at UI, conducting her own research on the applicable provisions in the ADA, and reviewing UI policies and procedures, Adams believed that UI was required by federal law to provide an employee with a handicapped-accessible parking spot nearest to the employee's work building." Dkt. No. 73 at 15. The cited deposition testimony does not fully support that assertion. However, Adams' Exhibit 227, found at Dkt. No. 71-10, does contain this language and thus provides evidentiary support for this

Adams had to make several requests and inform Vitangeli that she believed that the ADA required UI to designate a handicapped parking space in the Physical Plant lot before Vitangeli agree to provide the space. Adams does not remember how much time elapsed between her initial request and the space being designated. The space was chosen in consultation with Adams. Some time later a different space was designated because the original space was too close to the receiving area. Adams was not consulted about the location change, and the new location was prone to having ice and snow accumulation during the winter.

Between June 2014 and May 2015, Adams was the only woman who was assigned to work in the office in the Physical Plant. On October 7, 2014, Adams received an email from an account called "lindasucksballs@gmail.com," stating:

> You should really make sure you do your own job correctly before you try to criticize the others who do their job right Btw way [sic] your students hate thw [sic] way you treat them like shit. Mind your own business, [sic] everyone else's business is not your own. your [sic] students know more about what your job [sic] than you do so treat them right with respect.

Dkt. No. 67-9. Adams forwarded this email to Vitangeli on October 8, 2014. UI's IT department tried to track the email address but was unsuccessful; no further investigation was conducted.

On February 21, 2015, Adams completed an Employee Complaint and Resoultion [sic] Form in which she complained about incidents that had occurred between her and John Leck on January 27, 2015, and February 17, 2015. The form reads as follows:

> *Please describe specific details of your complaint—what happen [sic], approximate times/dates, etc:* Approximately at 9:30 a.m. John Leck approached my counter, where I work, with his sick day form. It was marked with his current

_____

factual assertion. In the end, however, it is irrelevant what Adams believed UI's obligation under the ADA to be and how she arrived at her belief.

5

sick time available. He asked me to check his time remaining. Because of a January event, I had already made a copy of his previous sick form. He then stated I messed up on his time and needed to correct it. Both events in question were about the same half sick day he erupted about before. The previous time he found his sick slip and held it up for me to see. He did not apologize for his accusation and behavior. John claimed on both occasions that he did not take the time in question off work. On February 17, 2015, John did not stop accusing me of making a mistake, until I showed him his time sheet he had marked and signed himself. He then said a quick sorry. I told him I appreciated that since he did not apologize the last time. He glared and quickly walked away slamming his door loudly after entering his office. His office is directly across from my desk.

***

*[P]lease describe your efforts to resolve your complaint.* I told Human Resources about my problem and concerns. I scheduled a meeting with Kory Vitangeli. I met with her in order to discuss John's behavior toward me in the present and in the past. She already knew of an occasion where I was approached by him and one of his employees. He has been able to behave aggressively without any repercussion.

*Please state the resolution you seek to resolve your complaint.* John Leck needs to stop falsely accusing me of things that are due to his incompetence. He needs a change of attitude from an unapproachable employee to one that seeks civility and harmony in the work place, instead of a work place that is a hostile environment. I believe he is discriminating me [sic] because of my sex and age. His bullying and aggressive tactics have to stop. Our Title IX workshop reinforces that this is inappropriate behavior. I believe his superior has not taken his aggressive behavior serious [sic]. I back this up because I feel the need to fill this form out. Someone else should keep track of his time off, John's office should be switched with grounds director's office or his door need to [sic] let out to the side hallway like the other directors.

*Is there any other information you would like to include?* The university has contributed to these events by leaving a key position open for over nine and a half months. After outside charges from OSHA and the EEOC, those in leadership know that bullying takes place in our department. I am proud of the way I have been able to do my job and expect a safe work environment, so my concentration can focus on our students and the campus. Due to wrongful accusations and aggressiveness towards me, I feel nervous, freightened [sic] at work. After this event, I was trembling and felt pressure in my chest way up in to the afternoon. This allowed behavior is effecting [sic] my health. The false accusations and aggressiveness needs [sic] to stop immediately. I now fear retaliation.

Dkt. No. 71-9.[3]

Outside counsel for UI investigated Adams' complaint against Leck. Leck was

interviewed by an attorney and Janet Robinson from UI's Human Resources ("HR") Department.

Leck was aware that it was Adams who had complained about him. Leck testified that he did not

recall specifics from the interview, but in general he was asked if he had "problems working with

female coworkers" and "problems working with people that were older than [him]." Dkt. No.

71-2 at 2-3. UI's investigation concluded that Adams' claim of discrimination against Leck was

unsubstantiated.[4]

On April 29, 2015, Adams met with Chris Raisovich and Janet Robinson of HR to

express her disagreement with the conclusions of the investigation. Raisovich's memo from the

meeting reads as follows:

> Today I led a follow up meeting between Linda Adams, Admin Asst. Physical
> Plant and Janet Robinson, HR. The meeting was scheduled because Linda told
> Janet she disagreed with the conclusion of the 4/9/15 letter given to her following
> her unsubstantiated 2/23/15 age/gender complaint. She also told Janet she had
> paperwork ready to go for the EEOC.

---

[3]Adams cites to "DOE 217" at 85:1-85:24 for the factual assertion that she spoke with
then-interim Human Resources Director Janet Robinson "about this harassment on multiple
occasions," but her Exhibit 217 does not include that page of her deposition transcript. It is
included in UI's Exhibit A; Adams testified that she was not sure, but that she believed that she
spoke to Robinson about the situation with Leck "more than once." Dkt. No. 55-1 at 20. The
other two exhibits cited by Adams for this factual assertion, DOE 226 and DOE 39, consist of
the complaint form completed by Adams; that document does not mention meeting with
Robinson multiple times.

[4]Adams cites to "DOE 42" for the assertion that UI "never assessed any discipline or
counseling against Leck because of this incident." DOE 42, found at Dkt. No. 67-13, is a letter
that was sent to Leck from Robinson and the investigating attorney that states that they have
completed their investigation and found that Adams' complaints of gender and age
discrimination were unsubstantiated. The letter does not state that Leck was not disciplined or
counseled.

I asked Linda how she was doing since the complaint and she said she was waiting for the next incident to occur since three already happened and she proceeded to elaborate on the past events. I had to ask/clarify a total of three times "what has transpired/how was she" "since the Feb 23 complaint"? Eventually she clarified that nothing more has occurred other than she's sending him emails (versus personal interactions), he stays in his office and leaves her alone (except when he came around her desk to get keys "which made her uncomfortable") and she told him she could do that for him.

She elaborated on feeling uneasy, uncomfortable etc. I asked her if she considered looking for a new job. She immediately said "Why should I look for a new job when he's the one discriminating, bullying me . . ." I reiterated the content of Janet's letter and explained that her claims of age/gender discrimination were thoroughly investigated by HR, our corporate attorney and included review of her details, the other side of the story, witness statements and "what occurred did not rise to the level of actionable harassment." I agreed that if John Leck slammed doors, yelled at her, etc. it was not appropriate and was rude, maybe frustration/irritation . . . but not discrimination or bullying. She said that Cory [sic] "gave him a pat on the back, let him get away with this" and later made a statement that the area has had 11 months of free for all behavior. I cautioned her about making assumptions that John was not talked to about this.

She went on to say that Kory discriminated against her because she refused a handicap parking spot since she wore a leg brace and had a handicap sticker/paperwork. She went on to explain that she gave Kory her research and proved she was obligated to provide one. She also said she told the EEOC about this but it's since all been resolved and hasn't pursued it. I asked if she considered the possibility that communication difficulties were occurring because she was pushing back on people that were her superior and as an AA she should take direction from superiors (Kory and John[)] and not give direction. I suggested that perhaps they were considering her insubordinate by her tone or manner, which was leading to communication difficulties. She didn't understand the term "pushing back", she returned to the specific handicap issue in detail and I kept trying to help her see "the bigger picture". After three or four attempts of trying to explain the bigger picture, I stopped.

I told her I was glad nothing has happened since late February, that there was a new Executive Director starting (this coming Friday) and nothing further should happen but if there is any cause to believe there is retaliation or discrimination (and I asked her not to use those terms lightly) to immediately contact me and her supervisor Kory. She didn't want to contact Kory. I told her I would insure that the situation was properly handled. She agreed.

I told her I heard she was going to the EEOC, and although it was her prerogative, my experience from working with them in the past was that they would put the

burden on her to substantiate her claims.  I again encouraged her to think about transferring jobs if she remained mentally and physically in caution mode, and while we couldn't force someone to hire her, we could help facilitate her through the process.  She said she would think about it and look at the postings.

Dkt. No. 67-15.

In May 2015, UI hired Pamela Fox as its Executive Director of Facilities, and Fox became Adams' supervisor.  Unlike Vitangeli's, Fox's office was located in the Physical Plant.  Leck's objectionable behavior did not end after Adams' complaint and resulting investigation or after Fox came on board.  Leck continued to make harassing comments and also "butted in" and eavesdropped on Adams' conversations.  Adams reported his behavior to Fox on "multiple occasions," Dkt. No. 71-10 at 3 ¶ 19; she specifically identifies two.  First, on September 4, 2015, during a meeting called by Fox to discuss Fox's concerns about Adams' job performance, Adams reported to Fox that she felt that everyone was "ganging up on her" and that "she [felt] bullied, specifically by John Leck and Mark Adams.  Ever since they were promoted they were after her.  She thinks they are whispering and laughing about her and that she is the joke of the Physical Plant."  Dkt. No. 70-2.  Further, on October 8, 2015, during a meeting with Fox about discipline being imposed on Adams, Adams asked Fox "if the other person (meaning John Leck) who keeps spying on her and turning her in is getting in trouble."  Dkt. No. 70-5 (Fox's notes from the meeting).[5]  Fox's notes further state that Adams "claims she is being treated unfairly, she is being picked on and it could even be a person retaliating (John) or upset that he did not get my [Fox's] job."  *Id.*  Fox added these notes to Adams' personnel file but did not share them with Adams.  Leck was never asked about these accusations.

---

[5]Adams does not cite to any evidence regarding the content of her complaints to Fox other than Fox's notes.

Fox was responsible for overhauling the Facilities Department and looking for more efficient methods of operation. To that end, in her written Operating Plan & Budget for the 2015-2016 fiscal year, Fox outlined several goals she wanted to meet. Among these goals were changing the administrative function of the Physical Plant by "developing the Administrative Assistant role to become the centralized hub of Physical Plant information through a new work order system; submitting distinctive job descriptions; evaluating the best coverage of the administrative function such as appropriately staffing the desk and evaluating use of student employees; evaluating types of paper document storage; initiating an automated timekeeping system; and creating a 'customer service Facility Coordinator position.'" Dkt. No. 56 at 4 (citing Dkt. No. 55-7 at 2-3, 18-28).

On June 29, 2015, after Adams learned that she was on a list of employees to be trained to drive a forklift, Adams met with Fox and informed her that she had been directed by a previous HR director not to operate a forklift and that she was concerned about operating a forklift because of her disabilities, a leg brace she was wearing at the time, the medication she was taking, and a previous injury she had sustained at work. Adams was not under any physical restrictions from her physicians at the time; however, she had not sought any such restrictions because her official job duties did not include any type of mechanical work. While Adams had been issued a permanent handicapped parking sticker, she was able to operate a car at the time. Despite Adams' concerns, Fox insisted that Adams train on the forklift and instructed her that

she should drive it if no one else was available to do so. Adams successfully completed the

forklift training and operated the forklift on approximately two occasions.[6]

Within weeks of Fox becoming Adams' supervisor, Adams witnessed Fox meeting with

other employees whom Fox supervised; those employees told Adams that Fox had provided

them with goals.[7] Fox's first one-on-one meeting with Adams did not occur until September 4,

2015. Fox memorialized the meeting in a note that was placed in Adams' personnel file; she did

not provide the note to Adams or inform her that it would be included in her file. The note reads

as follows:

> I met with Linda today from 2:45a to 3:20a [presumably sic] to discuss that
> Physical Plant needs to be a strong team environment, we need professionals that
> can work together. I expressed my concern that she was not showing
> professionalism based on the following:
>
> - I have been hearing comments and complaints about her attitude, which
>   can be sarcastic, smug and too busy to help others in our department
> - Specifically she has been sarcastically saying "Whatever you want" when
>   asked to perform a task
> - She ignores certain people when they come to the desk to put in a request
> - She yelled at Director Mark Adams on the phone over a ticket to reset the
>   timeclock to military time
> - She was observed by Dave Mosely in a verbal confrontation with John
>   Leck over sending emails to correctly direct people to HR for key requests

---

[6]The Court notes that there is a section in Adams' brief entitled "ON JUNE 29, 2015,
FOX INFORMED ADAMS SHE NEEDED TO BE TRAINED ON A FORKLIFT, EVEN
THOUGH ADAMS INFORMED FOX SHE WAS RESTRICTED FROM OPERATING A
FORKLIFT, AND AS A FORMER CUSTODIAN AND 57-YEAR-OLD ADMINISTRATIVE
ASSISTANT, HAD NEVER OPERATED A FORKLIFT." Dkt. No. 73 at 17. It is unclear to
the Court how Adams' age and position are relevant to either the propriety of asking her to take
forklift training or her ability to successfully learn to operate a forklift.

[7]Adams cites to paragraph 20 of her declaration for the following factual assertion: "Soon
after Fox became Adams' supervisor, Fox met with each employee she supervised, providing
each team member with goals, but she did not meet with Adams." Dkt. No. 73 at 17. However,
the declaration actually reads: "Within weeks of when Ms. Fox became my supervisor, I
witnessed her meeting with other employees she supervised and was told by these other
employees that Ms. Fox had provided goals to them." Dkt. No. 71-10 ¶ 20.

> Her responses on the following [sic] was basically she was not in the wrong on
> any of the above.  Everyone is ganging up on her, she feels bullied, specifically by
> John Leck and Mark Adams.  Ever since they were promoted they were after her.
> She thinks they are whispering and laughing about her and that she is the joke of
> Physical Plant.
>
> She does agree that she reports to me and indirectly reports to others in our
> department and expresses the desire to be treated professionally by others.
> I ended this portion of the conversation reiterating that I want a professional
> environment and respect among team members.  I invited her to come to me with
> specific examples of being bullied or ganged up on so that I may work to resolve
> her issues.
>
> In the same meeting I again expressed that it is my intention to reduce the amount
> of hours that we have student employees helping her with her job.  Additionally, I
> expressed that I would like to increase our operating hours from 7am-4:30p.  She
> prefers to start at 7am, I instructed her the intent of a 7am start is to get all
> contractor keys signed out and get all overnight work order tickets immediately
> out so the maintenance staff knows what to start on each day.  She has agreed to
> this work.  We will start this new time on 9/8 as long as she has student coverage
> from 3:30p-4:30p each day by a student.

Dkt. No. 70-2.  Fox did not inform Adams that this meeting was a verbal warning, the first step

in UI's progressive discipline policy, although Fox treated it as such.[8]

On October 1, 2015, Fox met with Adams again to discuss her performance.  In a memo

finalized on October 8, 2015, which constituted a written reprimand under UI's progressive

discipline policy, Fox stated the following:

> Linda, I continue to have concerns about your professionalism and how it is
> affecting the workflow and respect in our department.  We met on 9/4/15 and
> discussed the comments and complaints that I had received.  You had stated you
> felt ganged up and bullied by other members in our department.  I had
> asked that you come to me with specific examples so that I may address them.  To
> date, you have brought no issues.

---

[8]Adams notes in her brief that in this meeting Fox "criticized Adams' performance
although Fox had yet to sit down and meet with Adams about her performance expectations or
goals," Dkt. No. 73 at 17.  However, Fox's criticism was not about Adams failing to live up to
performance expectations or goals, but rather about Adams' treatment of other people.

Here are some of my recent concerns:

- I was informed that you recently responded "that's not my job" to a customer inquiry. Our customer called a maintenance tech and they were able to provide what was needed. The action I am looking for is one of customer service where you take notes and call our customer's [sic] back with information.
- I have observed you and Chuck communicating about the new NeoPost system. You are involved with the package delivery system, as you accept deliveries to Physical Plant, but I observed you being overbearing in your communication style with Chuck (you are giving direction on how he should arrange his day and the set-up [sic] his area) and not sensitive that he was being made uncomfortable. You are not Chuck's supervisor and he should not be made to feel overwhelmed by your involvement. If he asked for your opinion, please express it one time and let him work your ideas with his supervisor if he sees fit.
- We have discussed the need to back down student employees at the front desk, the deadline was 10/1 to back down on employee hours and I have yet to hear your new plan. You seem very concerned about the amount of students that housekeeping employs and have voiced your opinion to others that you have to back down your student hours and others do not. If you have these concerns, please address them with me, it is spreading negativity to talk to other employees.

Again, your role in our department is critical. You represent our department, you need to be professional at all times, approachable and have a customer service oriented attitude. I am very concerned that your actions that do not exhibit these competencies. These examples above are to show you concerns that I have heard about. I prefer that you talk to me about these issues and not others and expect no retaliation toward others.

If you are unable or unwilling to improve your performance, further action must be taken, up to and including termination. Please take some time to reflect upon the value of your relationship with the University. I trust that you will decide this where [sic] you want to be and that you will recommit to being a fully engaged member of the team.

Dkt. No. 55-7 at 41-42. Adams disputed the allegations in the memo and refused to sign it.

In addition to the items listed in the memo, at the October 1st meeting Fox also discussed another concern that she had (hereinafter referred to as the "parking space incident"). Another employee had reported to her that Adams had argued with co-worker Lori Gibson about the use

13

of a handicapped parking space.  Adams disputed that such an argument had occurred.  After the meeting, Fox spoke with Gibson, who told her that "it was not an issue with her," so Fox removed all references to the parking space incident from the final version of the memo.[9]

On October 5, 2015, Fox added a note to Adams' personnel file, which she forwarded to Samantha Karn, an in-house attorney for UI.  In the note, she memorialized Adams' comments during the October 1st and October 2nd meetings, her conversation with Gibson regarding the parking space incident, and her conversation with employee Kathy Johnson about another incident included in the memo—Adams' complaining to other employees about having to "back down" student hours.  Dkt. No. 68-6.  Fox did not share this note with Adams.

On October 6, 2015, Fox added a note to Adams' personnel file regarding a meeting she had with Lisa Battiato, an employee of UI.  Fox recorded that Battiato had reported two interactions with Adams in which she had asked Adams for assistance and Adams had responded "I don't have anything to do with that."  Dkt. No. 70-4.  Fox did not share this note with Adams.

On October 8, 2015, Adams met with attorney Karn regarding Fox's written reprimand. Adams informed Karn of her concerns with Fox's corrective action as well as concerns about Leck.  Karn suggested that Adams fill out a formal complaint.

In response to Fox's memo, Adams filed an Employee Complaint and Resoultion [sic] Form with the HR department.  The form read as follows:

---

[9]Adams' brief includes the factual assertion "Before writing Adams up, Fox failed to speak to any employee who was actually involved in the purported incidents. (DOE 110; DOE 217 129:15-130:21; DOE 221 202:10-202:24)."  Dkt. No. 73 at 18.  None of the evidence cited addresses Fox's pre-meeting investigation of any of the incidents other than the parking space incident.

*Please describe specific details of your complaint-what happen [sic], approximate times/dates, etc.:* A Corrective Action created based on 'hearsay, misunderstandings, and untruths.'

On October 1, 2015, Pam Fox told me she would like us to "get together and talk." She presented me with a "Performance Needing Corrective Action'" document. This came as a complete surprise to me, because previous to this meeting Pam had never met with me to talk about any of my actions that would require disciplinary action. (And, on [sic] as side note, in the 17 years I have dedicated to the University, my professionalism has never once been called into question. In recent years, I received an outstanding service award from the College of Arts & Sciences. And in 2012-2013, as a student of the University, I was nominated and received the Alpha Sigma Lambda award). Furthermore, every bullet point in this Corrective Action document contained hearsay, misunderstandings, or untruths. When I mentioned the inaccuracies, Pam would just say, "Linda, you're diverting" and move on. In our brief meeting Pam told me that I needed to sign the Corrective Action document.

Because of the false accusations Pam presented, I asked her to meet with me on Friday, October 2, 2015. I explained to her the issue I had with each point including:

(Please read Pam's corrective action and then the points I shared with her below for each one.)

Bullet 1:

I take my job very seriously. I work to provide the highest standard of customer service to all. I work to assist people in any way I can. I always work to satisfy each customer's need whether I complete their request myself or refer them to the proper person who can. To date, Pam has yet to give me any specifics about this incident like date, name, issue, etc. Pam also is presenting this information as a secondary source. The Corrective Action states, "I [Pam] was informed that . . . ." My hope would be that, and I do not foresee this, but should a customer not be completely satisfied with the service I give, then as per the employee handbook, Pam would "work this out on an informal basis," and the issue would be solved "fairly."

Bullet 2:

Thursday, October 1, 2015—I told Pam that this handicap spot issue was completely untrue, I also asked her if she had spoken to Laurie Gipson, the person listed as "other driver" in the Corrective Action document. She said she had not. Pam put in the document that someone had "informed" her about this incident. And in our meeting, I found out that Pam had not sought to understand the facts

first before putting this ridiculously false accusation on the Corrective Action document.  She also did not believe me when I told her the true story. I told her she was welcome to contact Laurie if she was not going to believe me.  When she did, Laurie verified that <u>everything</u> that Pam had accused me of was <u>false</u>. (Finally, after all of this, during our meeting on Friday, October 9th, 2015, Pam did remove this bullet from the Corrective Action document)  <u>But</u>, it is discouraging that due to Pam receiving and believing hearsay that not only did my trustworthiness get called into question and I was falsely accused, but an employee dealing with serious health issues, Laurie had to be involved.

Bullet 3:

This is what I shared with Pam on Friday, October 2, 2015:

"In regards to the NeoPost system, you asked to provide my input on the flow of the system.  As you stated in this document, "my role in our department is critical."  Chuck asked me to come in and discuss the system and where packages should be placed.  Having a professional conversation with a colleague is not something that needs corrective action.  The concern is that my involvement has caused Chuck to feel "overwhelmed"; however, the day following this interaction on October 1, 2015, Chuck personally thanked me for my assistance helping him with the NeoPost system in the way he wanted it to flow.  Chuck also shared with Pam that I really helped him out especially with two trucks coming in."

Even with these facts, if in Pam's opinion she thought I was "overbearing" in my communication style with Chuck," [sic] then why would she not have verbally addressed that with me in a timely fashion.  As the handbook states, "quickly" and fairly"?  Under Disputes and Disagreements, the handbook clearly says that issues should be "resolved on an informal basis by discussing the problem and working together to find a solution."  If Pam did not want me to tell Chuck that I felt that small, scattered packages laying on the floor was a safety issue and could lead to someone tripping, then she should have discussed that with me right after the fact. (It should also be noted that myself along with student workers are the ones who walk through this area on a regular basis.)  If Pam no longer wants me to collaborate with Chuck, like she had asked me to do previously, she needs to give me that directive first before writing it up in a corrective action.

Bullet 4:

This is what I shared with Pam on Friday, October 2, 2015:

"In regards to backing down student hours, this was done before the deadline and communicated to Pam.  At no time was I asked to present a formal plan, I was only casually asked to back down student hours, which I did.  I am not concerned about the amount of students that housekeeping employs.  My focus is to

complete my daily tasks and be professional at all times in representing our department."

***

I feel like through all of this, Pam attacked my professionalism and commitment to the University of Indianapolis. She also did not, as the handbook states, provide a "prompt response" after the meeting we had on Friday, October 2, 2015 when I presented my issues to her about the Corrective Action document. She said she would, "digest" what I said and "get back with me on Monday, October 5, 2015. She did not meet with me again until the end of the day on Friday, October 9, 2015. And, even in that meeting Pam was not receptive to what I had to say. The handbook says that "Ongoing, effective communication serves the best interest of both parties and reduces formal grievances." I do not feel that Pam is allowing productive communication to take place. Furthermore, she does not seem to be on track with the handbook of wanting to reduce formal grievances (especially, when she has created a document with inaccuracies), because at the end of the meeting she still would not take all of the incorrect information off the document. She said, "I cannot do that; I cannot remove anything else." This is very disturbing and an obvious violation of the handbook and University policies.

***

*Please describe your efforts to resolve your complaint.*

On October 2, 2015 I requested Pam meet with me. She suggested we wait until Monday. I then stated the accusations were too serious to wait. She came back to the office towards the end of my shift to meet with me. I rebutted each of her accusations. She wanted to know if she could have my paper. I told her it was my notes and I would go back over the items with her and she was welcome to take notes. She said she had to digest what I discussed over the weekend and we would meet on Monday, October 5, 2015. Because [sic] the serious nature I called her boss, Mike Holstein's office and asked for a meeting with him. He was getting ready for vacation. I was advised to e-mail him, which I did. I received a call from his office that Jennifer Rang would e-mail me to setup an appointment with Sam. I received e-mail from Jennifer Rang with appointment times to speak with Sam the university attorney. I met with her on Thursday, October 9, 2015. She asked questions and I sought her advice on my options at the University to have the Corrective Action removed from my file. She gave me the information to follow up with a formal complaint since meeting with Pam brought no resolution. She also said I should meet with Mike Holstein when he returns from vacation. Sam was going on a cruise but would check e-mail when she could. She encouraged me to e-mail her if there was anything else I felt I needed to discuss with her.

I am now proceeding with a formal complaint, since it is clear that Pam wants no part of working through the accusations. Her mind is made up, and she said she will place the Corrective Action in my permanent file without me signing it. I could attach anything l wanted to the document.

*Please state the resolution you seek to resolve your complaint:*

I expect the Corrective Action form to be removed from my file immediately. The university and I need to know who told Pam the false accusation concerning the handicap parking story (Bullet Point #2) that Pam wrote into an official corrective action without checking any facts. If the person has ever received a grievance from me then their gossip and untrue statement to Pam should be considered retaliation and appropriate action needs to follow according to the staff handbook.

Pam must stop all attacks on my professionalism and character. She should not encourage employees to not work together when work or events within the department need to be addressed and solved in a professional manner. She should stop micromanaging and attacking everything I do and be a collaborative supervisor while being open to learn what all my duties entail. Each day brings new and different situations that require my attention.

I expect to be treated in a professional manner, and not be subjected to retaliation by anyone involved in this process.

*Is there any other information you would like to include?*

Pam not only attacked my professionalism, she had my job duties changed. Even with my ankle brace due to an injury, she wanted me to be certified on the forklift with the guys. I told her when a director inquired with Human Resources to ask if I could be trained in the past, they had said no. I made Pam aware of their comments, and she said she would still like me to be trained. I did as she asked regardless of my disability and the medication that I take.

No one should have to work in a hostile work environment with a supervisor that writes a corrective action without any warning or a desire to first communicate with the employee about the concerns. I expect to have a professional supervisor who demonstrates 21st century skills by working collaboratively with employees and seeking first to understand.

Pam asserts that she is being told that I "glare" at my coworkers, which is completely false. Is the anonymous source of that accusation the same as the person who told her the untrue handicap parking story? I think it's clear that Pam's anonymous sources have lost all credibility particularly in the

unprofessional way that she believed that gossip and wrote it into a corrective action without asking any of the witnesses.

I don't want to have to take this to the next level. I want this resolved. The stress of this harassment is affecting my health. I have dedicated 17 years to the university and have showed professionalism and commitment throughout this time. I want to be able to work free of harassment and without fear of unwarranted corrective actions or retaliation.

Dkt. No. 67-11.

As suggested by Karn, Adams met with Mike Holstein, Fox's direct supervisor, who was head of HR at the time, regarding the written reprimand by Fox. Adams attempted to share with Holstein a document she had written refuting each of Fox's criticisms, but he did not want to read it. Adams' impression was that Holstein was not interested in hearing her complaints; he instead advised Adams to "rededicate [herself] to the University" and advised her that she needed to "behave." Dkt. No. 70-19 at 49, 55. Following the meeting, Holstein spoke with Fox and Leck regarding Adams' concerns. On November 12, 2015, Holstein sent Adams an email that read as follows:

I have reviewed the information provided by you to me at our meeting in October as well as information provided to me by your supervisor, Pam Fox. Based on my review I have determined the performance evaluation feedback provided to you verbally in September and in writing in October is supported by numerous sources and therefore credible.

The purpose of the meeting this afternoon between you, me and Pam Fox is to review with you your Job Description and obtain your signature on the form acknowledging your responsibilities and performance expectations. The provision of excellent customer service is of utmost importance to your job responsibilities.

It is your supervisor's belief that you possess the capability to perform the job requirements and perform in a manner that meets or exceeds expectations. It is the hope of the university that you do so going forward.

Dkt. No. 67-14.

On November 12, 2015, Adams, Fox, and Holstein met regarding the written reprimand.[10]  With the exception of the parking space incident, Fox and Holstein declined to remove statements from the memo despite Adams' disagreement with them.  During the meeting, Adams discussed her concerns with her personal safety in operating a forklift and the fact that operating a forklift was not in her job description.  The group also discussed the fact that Adams had two separate work email accounts, one of which she monitored constantly and one that she did not check as often.  Fox had been using the latter to communicate with Adams; Holstein suggested that Fox text Adams instead.  Adams' notes indicate that Holstein "stated several times that [she] had filed with EEOC" and that Adams clarified that she had not filed with the EEOC but had filed an internal complaint against Leck.  Dkt. No. 72-6.

In preparation for the implementation of a new work order submission system, on March 22, 2016, Fox sent to the following email to Adams:

> Let's get organized (and maybe you already are!).  Please make a list of our "regular" customers who submit work orders.  Let's get 2/week converting to the new method.  Some will be really easy . . . and some are going to take some face-to-face meetings to work things out  . . . .
> Make you[r] list by Friday is [sic] this week and send [it] to me.  Next week lets [sic] start knocking [sic] 2/week.

Dkt. No. 68-8 at 2.  On April 25, 2016, Fox sent Adams a follow-up email that read "Linda, I had sent this request to make a list so that we would have a starting point to know who needs to be

---

[10]Adams asserts that during this meeting she "said Fox had 'never laid out what she would like to see with [Adams'] job before writing [Adams] up.'"  Dkt. No. 73 at 19.  The document she cites in support of this assertion, "DOE 84," which is found at Dkt. No. 68-7, does not support this assertion, as it consists of undated, handwritten notes that give no indication that it relates to the meeting in question.

taught about the button and to map progress.  Tomorrow when we meet with Mike Nolot we can

discuss.  We need a plan in place to get this piloted and announced."  *Id.* at 1.

On April 29, 2016, Fox sent a note to Adams' personnel file that read as follows:

Today I sat with Linda about my concern with her performance regarding my
request to create a list of customers who frequently put in work orders.
I had asked on 3/20/16 via email (see below) for her to make a list. No list was
made and Linda did not update me on her progress. I asked in several weekly staff
meetings (4/11 and 4/25) for the status of the list.

There was a meeting on 4/26 regarding Timeclocks Plus where we also talked a
little bit about the work order system.  I again asked if she had created a list, she
had not and I asked her to create a list of users by Friday (4/29) for our meeting
with Mike Nolot.

Linda had not created list for Mike's meeting regarding the work order system.
I asked her why she did not create the list as I had requested

- First she stated it would have been hundreds of people long so she decided
  to use a copy of the department list and make notes for that.  She did not
  share that list
- The[n] said she didn't understand what I wanted—I asked her to ask for
  clarification when she does not understand
- Then she said she didn't have enough time, the desk is very busy and she
  has student limited time at the end of the year.  I reminded her my original
  request was from 3/20/16.

I explained to her that I will be expecting more of her as the work order system
becomes automated.  I expect her to ask questions, update me and give feedback
when she cannot complete an assignment.  I also told her I felt like my request for
this list went into a black hole.

I changed the subject and asked for status on the certificate of insurance
spreadsheet that she said she would begin on 3/11/16.  She claimed she was sick
and was going to tell me she needed to go home.  I asked to see her work to-date
before she left, if she was leaving early.  She was not able to produce any work,
she claims she started one using Mark's subs but can't find it.  She said it is an
excel spreadsheet.

*Id.* Fox did not share this note with Adams or inform her that it was going to be added to her personnel file.[11]

On March 11, 2016, after several emails were exchanged between Fox, Adams, and someone from an outside insurance agency regarding the need to check, log, and track the insurance certificates of various contractors and vendors working on campus, Adams stated that she would "get a spreadsheet started for our department" in order to facilitate the development of a tracking system. Dkt. No. 68-9 at 1. On April 29, 2016, Fox emailed Adams to request a progress update on the project. On May 2, 2016, Fox sent an email to Adams' personnel file that read:

> Linda had not started the insurance certificates as she stated she would on 3/11/16. On Friday 4/29 she said she did start and was working with Mark Adams and could not find her excel file.
>
> On Monday a word document was in my inbox, it's the start of a list of vendors who may need insurance certificates. She said she could not find the file of insurance certificates (I took it home to review the file, it is a very old file with insurance certificates dating from 2010—one is dated 2016 but it's not a vendor that we use).
>
> She came to me saying the file was missing, I told her I took it home to review. I also told her that I could see she did not start the project and did not talk to Mark. She said, "oh did I say Mark? I was very dizzy on Friday and needed to leave", she said she did not remember saying Mark was helping her and that she overdosed on her medication.

---

[11]Adams states in her brief that many of Fox's notes to Adams' personnel file "were suspiciously backdated—for instance, Fox sent multiple emails on June 8, 2016 about alleged verbal warnings on April 29, May 2, and May 11, 2016." Dkt. No. 73 at 40. However, these discussions with Adams were contemporaneously memorialized in emails as well as being reported to Cripps in emails dated June 8, 2016. *See* Dkt. No. 68-8 at 2 (email from Fox to file regarding April 29th discussion); Dkt. No. 68-9 (email from Fox to file regarding May 2nd discussion); Dkt. No. 55-7 at 60 (email to Fox from Dave Oldham, who witnessed and memorialized the May 11th discussion). Counsel should take care not to make an accusation of "suspicious" behavior without considering all of the relevant facts.

I was very clear in my direction and she said that she understood:

- She is to talk to Charlie Vaught or Andy Brown about the specifics needed
- She is to bring up to the group on Monday 5/9 during our staff meeting what she needs from everyone
- She is to update me on how she plans to finish the project on Tuesday 5/10

*Id.* Fox did not share this note with Adams or inform her that it was going to be added to her personnel file.

On May 11, 2016, Fox counseled Adams about following up on tasks she had agreed to undertake. Adams had agreed to obtain a menu from a nearby restaurant in order to assist with a lunch event, but she still had not done so by 4:00 p.m. the following day, which was the end of her shift.

Fox met with Adams on May 20, 2016, the day before Adams was scheduled to leave for vacation, and presented her with a written warning. Prior to the meeting, Fox exchanged emails with Director of Human Resources Erin Farrell about the situation; in one of them she noted that Adams had received verbal counseling on May 10, 2016, and that Fox had "instructed the directors to feed her more tasks with definite deadlines; I have tasks lined up for her when she is back from vacation. As soon as any of these fall short, a final written warning will be issued." Dkt. No. 68-10. This email was not shared with Adams.

The May 20, 2016, written warning read as follows:

Linda, I continue to have concerns about your effort and communication. You are a key person in our department, the face-person to the campus and our link to the campus. As the work order system becomes more automated it allows more time for different administrative duties. I need to count on you to support the Facilities' department. When you do not follow direction or communicate it becomes a weakness to our entire department; we lose credibility and reputation.

The following are examples of two situations, the outcomes.

Situation 1: work order system

We installed our new work order system in July 2015; the goal was for the work order "button" to be on the new facility web page and to conduct a soft roll-out before a campus-wide announcement.  The plan was for the IT department to turn on the facility web page with the button over Spring Break (4/4/16).  Our soft roll-out was to educate users to start using the button until the point that most were converted to our new method.  Once we made the campus-wide announcement, most people would already be using it and we would have worked out any issues.

The following summarizes your failure to meet performance expectations concerning this project:

- On 3/22/16 (Tuesday) I sent via email to ladams@uindy.edu a request for you to create a list of our "regular" customers who submit work orders.  The deadline was 3/25/16 (Friday).  The purpose was to understand the amount of customers and to define easy versus hard transitions.  I also set a goal of transitioning 2 customers/week.
- No list was ever created; no questions were asked and no update was given to me
- In our weekly staff meetings I regularly asked about the work order system and our need to complete our roll-out and announce the system campus-wide. Your responses were always about who was having trouble and who was using it.  I instructed you to make a list because only you know our customer list and I could not follow where we were with the transition.
- In staff meetings on 4/11 and 4/25, I specifically asked the status of your customer list.  The response was more conversation about who was or was not using the button.  Again, without the customer list I was unable to follow where we are with the transition.  I specifically asked for the customer list to be generated for a 2:30 pm meeting with Mike Nolot on 4/26.
- I followed up our conversation via email to ladams@uindy.edu explaining that the reason for the customer list was so we could have a starting point to know who needs to be taught to use the button and get an action plan together to pilot the button and announce campus-wide.
- On 4/26 when we met with Mike Nolot you did not have a customer list prepared. You did have a copy of UIndy's department list with some names on it, but no concrete list that could be passed out in the meeting. We attempted to have conversation about some more difficult groups to transition (campus police, dining); however, without a comprehensive list of customers we could not understand our whole scope of work.  We decided to continue our conversation later in the week.

- I then instructed you to set a meeting with Mike Nolot and us and to have the customer list for that meeting. You set the meeting for 4/29/16 (Friday) at 8am.
- For the 4/26 meeting with Mike Nolot you did not prepare a list. You again came with a copy of the UIndy department list. In effort to save the meeting, I pulled out paper and began listing out those that are more difficult transitions in effort to fully understand the amount.
- Later in the morning of 4/29/16, we sat down to discuss the issue of not creating the list as originally requested back in March. I explained that as the work order system becomes more automated, there will be time to tackle other work. I need to count on you to follow direction, handle more work and ask questions if direction is unclear. Your responses were as follows:
  - A list of customers would have been 100s of people long so you decided a copy of the UIndy department list was satisfactory
  - You didn't have enough time to complete the work as the student workers can't work as many hours at the end of the semester; I reminded you the original request was on 3/20/16.
  - Then you said you didn't understand what I wanted. However, your first response that the list would be 100s of people long indicated you understood what was needed.
  - You also stated you were not in your ladams@uindy.edu email very often.
- I requested that you set a follow-up meeting with Mike Nolot, we met on 5/18/16 and you had a draft of the customer list. Only now can we have meaningful discussion about transitioning our customers over to the work order button.

Situation 2: insurance certificates

- On 3/9/16 I made an email introduction for you and Andy Brown of Greggory & Appel to start conversation about how to make UIndy compliant on insurance certificates. After some email conversation, you stated you would start a spreadsheet on 3/11/16 to track our insurance certificates.
- On the morning of 4/29/16 I asked for a progress update on the spreadsheet via email and received no response.
- Later the afternoon of 4/29/16 I asked for a progress update, you stated you were sick and needed to go home. I asked that you please show me your progress before leaving for home.
  - You could not locate the excel file.
  - You stated you were working with Mark Adams to determine what vendors needed insurance certificates. (However, when I questioned him, Mark was not aware of the project)

- You showed me a file of certificates that you were collecting. (I took the file home to read through it; it was not current)
- On 5/9/16 you were to announce this project to the directors in our weekly staff meeting; you created a spreadsheet, did a good job explaining your needs of them and extended a 2-week deadline for information

The above behaviors demonstrate both a lack of effort and a failure to communicate with me on project status. Due to your failure to perform adequately on these projects we were unprepared for our meetings with the IT department and delayed on identifying a plan to roll-out the new work order system or make an announcement.

Again, you are a critical member of our department and we need to rely on you.

Should you fail again to meet my expectations for your performance, progressive discipline, up to and including termination of your employment will result.

Dkt. No. 69-7. Adams refused to sign the written warning form.

Following her meeting with Adams, Fox emailed Farrell the following:

I just met with Linda—there was alot [sic] of rambling discussion of which I kept coming back and saying she is free to add comment to the written warning and submit it. She would like to take this home and think about the comments to write; she said she would return it when she is back from vacation on 5/31/16.

Interesting comments of note:

- Her husband knew I was going to come to her today with some kind of written warning; he was a director and can tell by her comments to him that I was preparing to write her up. I replied he must have known that I had given 2 assignments in March that were not completed.
- She stated I never liked her from the start and I let the others get by with missing assignments. I told her this meeting was about her, no one else. I also told her I am holding everyone including her accountable for their work.
- She said she couldn't get to these assignments because of other priorities, I told her she needs to communicate when she needs help setting priorities so I understand she is too covered up to complete them all.
- She said she has too many functions to be able to get everything done. She has a student, I cut student time to 20 hrs/week. I asked her to evaluate if we have students here are [sic] the right times and set a meeting to discuss her thoughts on 6/2/16.

Dkt. No. 68-10.

In a written response to the written warning, Adams stated the following:

Pam, I am grateful for the opportunity to address our concerns with working together as a team. Being the face-person between the campus and physical plant has brought me much joy and meaningful connection over the last 14+ years. This is often demonstrated by campus employees requesting to speak to me as they know I am responsible and capable to get the job done properly. I am excited for the automated work order system to be up and running, as my work load has increased with what feels like unreasonable expectations.

Situation 1: Work Order System

It is unfortunate there has been so much miscommunication between us. I would like to better understand what you are wanting from me when you have a project you would like completed a particular way. I better understand when you give me the full picture of the situation, and I feel as part of the team.

My understanding of the project was to start with a soft roll out where I gather a few customers per week to start using the button. I was asked to create a list of regular customers which I did, in a way I understood, that also seemed to be the most organized and time efficient. The list I created was not good enough for you. You refused to even look at it or understand what I was doing. As a leader, I believe detailed instructions should be given to your employees to produce the best version of the materials you are imagining. This is critical for veteran employees who have been successfully using proven methods to get things done. It is astonishing how much detail is expressed in these write ups, given the lack of collaboration to communicate the details I was not understanding for this project.

I am someone who learns and understands through teamwork, positive feedback, and constructive criticism. The teamwork needed to complete this project includes sitting down with me one-on-one in a non-judgmental, non-threatening environment to go over the format and details of the list. I also would have appreciated being listened to and understood for why l was completing the project the way I thought was most efficient. We could have worked together to see if there was another way to make this list that you would understand, and would not take more time away from my increasing work load and campus focus.

I agree, I kept you informed during weekly meetings about our progress with the system. It is clear you have a lack of trust in me and the IT department I've been working with for this project being ready to go live. I expressed to you in April that we were ready to go live, but it seems a barrier was found to hold off on going forward with the project. It doesn't seem like any list I could have made without exact detail from you would have been satisfactory. It seems unnecessary

to hold off a breakthrough project to the campus because a list was not delivered in the exact format expected.

l believe the underlying miscommunication comes from me thinking I know the best way to do my job, and you not understanding my role and everything I do for the campus. You expressed to me a year ago you would sit down with me to understand my job and how I work. You did not keep your word or make the intention to make time for me. I believe if you took the time and effort to follow through, I would have a more clear vision of your expectations. You could have also gained more clarity on the best way to communicate with me for an enjoyable and productive work environment.

It is also interesting, now that the list is closer to your expectations, why the project is not live. Over the last two months, each time I was asked if we were ready to go live I said yes. I am certain the list I have created now will be beneficial in identifying who is struggling with the system. Although, I have full confidence in the employees at this institution for higher learning to understand and adapt to the new system; I am here to support those who need it.

Situation 2: Insurance Certificates

While meeting the demands of the extra work load including utilities, helping with unexpected projects from directors, and continued responsibilities of campus needs, this project did not get completed as early as expected.

The requirements for the SOS compliance deadline as well as preparing for graduation, resulted in many non urgent projects to be put aside. Unfortunately, the insurance compliance was a project that although very important was not as urgent which contributed to its delay. I find it odd many employees are reminded of projects and deadlines at team meetings, but you had no follow up with me for over a month. I will not assume, but it almost feels intentional you forgot to mention anything to me in hopes l would forget, and you would have a reason to write me up. I often feel if I make one mistake I will lose my job, and everything I've worked for over the past two decades. The pressure has been difficult on my life.

The unfair treatment of employees has not gone unnoticed. I am managed with a coercive power style, using punishment and criticism when things are not done to your exact preferences. It seems you want me to only do things your way and add no creative energy to the campus. I notice most employees experience a democratic leadership style where you allow full participation, discussion, and making decisions together. I will not imply the reasons for the discrimination, but no matter the reason it has left me feeling hurt, depressed, unappreciated, overwhelmed, and devalued.

Working in this environment has taken a serious hit on my health and wellbeing. I have been struggling with depression and anxiety over the last year and a half. I have been sick at work, unable to sleep, or even relax when I get home with my family. My body, mind, and emotions have been through more ups and downs than I thought I would be strong enough to handle. This style of management has caused physical symptoms of high blood pressure, anxiety at levels close to losing consciousness, and digestive reactions that kept me in pain for hours. I expressed to you on 4/29/16 I was feeling sick and dizzy. You had no empathy for my wellbeing and still demanded to see a project you hadn't been concerned about for over a month. You did not follow up to see if I made it home safely, or if there was anything you could do for me at the time.

Over the last year I have felt harassed, intimidated, unappreciated, and discriminated against by you. I have learned to manage my depression, anxiety, and outlook on life differently over the past few months. It has been a long road to coping with this debilitating illness. Unfortunately, this style of management has led to many set backs on the path to living a more adjusted, happy life. I have persevered through all the demeaning treatment due to my love for the campus students, fellow faculty and staff. I am also exceptional at what I do, and receive fulfillment being part of the physical plant team.

I am more than happy to do things your way. I need proper instructions and details until I have a clear understanding of your style. I am also willing to take on any additional projects as long as it does not take away from the immediate needs of the university and well being of everyone on campus.

This has been one of the most difficult years in my career, and although it hurts, I hope this is just about me as I would not want any other employee at UIndy to experience this treatment. I also hope that this can lead to a new chapter in our work relationship. "The farthest distance between two people is misunderstanding." Now that we have had a chance to clear the air and understand what needs to happen next I am positive things will only get better from here. I am ready and willing to work together as a team, with clear and constant communication as needed, to get the best results possible for the university. Are you ready to work together?

Dkt. No. 69-8. Fox was not aware of this written response until after this case was filed.

Adams was due to return from her vacation on May 31, 2016. Instead of returning to work, Adams requested and was granted FMLA leave until June 6, 2016, due to neck pain and muscle spasm related to a pinched nerve. In an email to Farrell on June 1, 2016, Fox noted that "it's been an undocumented pattern that medical issues arise when disciplinary action occurs."

Dkt. No. 70-6.  Specifically, she noted that on April 20, 2016, when Fox had "challenged [Adams] on her excuses, she replied she accidentally took too much medication and didn't know what she was saying"; on April 29, 2016, when Fox had asked Adams for a progress report, Adams had told her that she was sick and needed to go home; and on May 30, 2016, the day before Adams was supposed to return from vacation and complete the paperwork with regard to the May 20th written warning, she reported that she would not be returning to work due to an injury.  *Id.*

On or about June 1, 2016, Fox discovered that Adams had not made copies of UI's electric bills for the previous two months and she had not processed some utility bills that were due on May 23, 2013, before she left for vacation on May 20, 2016.  Fox and another employee reviewed utility invoices and vouchers and discovered that Adams had made numerous errors in processing them.

On June 6, 2016, Julie Cripps from the HR department emailed Fox to inform her that Adams would be bringing Fox a form relating to her FMLA leave and subsequent lifting restriction.  Fox replied that Adams

> said she didn't have anything for me to sign, she said say she's on prednisone and pain killers.  Do we have an issue with her working while on medication?  I didn't see anything in the handbook.  I do need to sit down with her and finish the written warning that was given before she left on vacation.  She will either sign or not sign, I know she will state she's on painkillers now.

Dkt. No. 70-16.  In a handwritten note dated June 7, 2016, Fox noted that Adams' FMLA paperwork needed to be signed; that she needed to "[s]it down w/ Linda–sign today and acknowledge no documentation that says you need to take medication.  Not unable to perform her job.  Next time may be dismissal"; and "final written warning w/ Julie & give copy."  Dkt.

No. 69-17. Fox did not ask Adams for documentation regarding Adams' need to take pain

medication during her June 7, 2016, meeting with her.

On June 8, 2016, Fox gave Adams a final written warning that read as follows:

Linda, I continue to have concerns about your work. As the work order system
becomes more automated it allows more time for different administrative duties.
I need to count on you to support the Facilities' [sic] department.

In early March, Linda took over processing IPL invoices, previously this was
done in accounting.  Facilities took over this function so that we could review for
errors and start to track electrical usage.

Processing the invoice includes the following steps:
- Calculating an allocation using the excel spreadsheet that accounting
  provided
- Creating a voucher cover sheet for Dave Statler's signature
- Making a copy of the entire bill and voucher
- Forwarding to accounting in a timely manner to avoid late fees

The following are mistakes found in processing the invoices.
- The latest sixteen vouchers are incorrectly labeled with a date of 2/1/16;
  this makes it very difficult to refer to a particular invoice
- Invoice due 5/10/16 for $160,438.62 is missing a copy of page 2
- Invoice due 4/7/16 for $38,173.29 is missing a copy of page 3
- The same invoice due 4/7/16 was incorrectly coded to the wrong account
  (224010), accounting now needs to do a journal entry to correct the
  mistake.
- In a batch of vouchers processed on 6/7/16 you had incorrectly coded a
  $12 item to the wrong index and Dave Statler asked you to make the
  correction.

Training was provided from accounting in February, you have shown that you are
able to correctly process these invoices.  Dave Statler often refers to the electric
bill copies as he is setting up baseline electrical usage across campus.  The errors
above make his job more difficult and he cannot rely on the data.

The above demonstrates a lack of work effort.  It is important that the
administrative functions that you do are accurate.  Again, you are a critical
member of our department and we need to rely on you.

Should you fail again to meet my expectations for your performance, termination
of your employment will result.

Dkt. No. 69-9. Adams again refused to sign the form. Adams testified that she disagreed that the automated work order system resulted in more time for her to do other work, because the system required her to perform time-consuming work. She was unable to say whether she or a student worker made the copies of the invoices that were missing pages. She also testified that another employee, Dave Statler, "was changing codes on a constant basis" and that could have caused the incident in which an invoice was given the wrong code. Dkt. No. 70-19 at 65.

On June 10, 2016, Fox emailed Julie Cripps in advance of a planned meeting with Adams. The email read as follows:

Hunter Wells is a student that work [sic] in Facilities' office with Linda every day from 12:30p - 1:30p. She has been sick:

- Monday (6/6) - Hunter worked but didn't feel very well
- Tuesday (6/7) - Hunter was vomiting and had a fever, her grandmother called in sick for her
- Wednesday (6/8) - Hunter came to work, but looked terrible. I asked her if she was ok, she told me she still vomiting as of that morning.
- I spoke to both Hunter and Linda saying Linda could call in Sabrina Beasley if Hunter needed to go home; I left them talking about her condition.
- I saw Hunter still working, asked her how she was. She replied she did not feel well but would stay and try to work.
- I noticed Linda was not at her desk about 3pm; Hunter told me she went to a meeting (I was not aware she was leaving for a meeting). I now conclude that Linda needed Hunter to cover for the 2:30pm unannounced meeting.
- I again asked Hunter how she was feeling. She claimed she did not want to come into work that day, but Linda was so "nasty" on the phone with her grandmother, she was scared to call in sick. She was afraid she would loose [sic] her job. She wanted to call in sick today, but Linda was so "nasty" to her grandmother she came in anyway and didn't want to loose [sic] her job. Mark Adams witnessed the conversation.

Linda was asked to work on sticker clings for the PTAC (air conditioning units); we had wanted them delivered in May to install one sticker/PTAC as maintenance was performing preventive maintenance in the dorms:

- 5/1 Linda was asked during a staff meeting to contact Kory where she could source clings
- 5/9 Linda announced the clings could be sourced through Moeller Printing, we determined to order a count of 2,000 and Dave Oldham confirmed clings do stick to PTAC units
- 5/16 we discussed cost, Linda was asked to get pricing on 2,000
- Sometime in this time period, Linda was working with Peter Noot for a design
- 5/25 Linda sent me a text during her vacation with the price of $780 for a roll of 2,000
- 5/25 I thanked Linda for getting the pricing and asked where I would place the order for clings
- 5/26 Linda told me the leadtime was 8-10 days & to call Tom Mulligan; I asked for a company name and she never replied. I could not place the order.
- 6/1 Linda sent me a text that her email with the contact information did not go thru, she texted the info; I did not have time to place the order.
- 6/6 Linda announced during a staff meeting that the clings were ordered and they would take 4 business days for delivery. I was pleased that was taken care of because I did not order them.
- 6/8 Linda asked Mark to approve the cling art so she could get them ordered
- 6/8 Mark responded to Linda via email that he already approved the art back in May and to please get them ordered
- 6/8 Linda replied via email that Chuck asked for another approval and that she was complying with his wishes
- 6/10 I spoke with Chuck Moeller, he stated he never received art approval until 6/8 when he began the order (there was no second request by Moeller)
- Now that these clings are corning so late during the summer preventive maintenance, we now have to send a tech or student back through all the dorm rooms to individually place a cling. They could have otherwise been installed while they were working in the room.

Erin Farrell and Julie Cripps inquired as to how Linda became certified to use a forklift and how often she uses the forklift to receive deliveries:
- During meeting in August/September we discussed who should receive forklift training, Linda ask [sic] me if she should be certified in case deliveries came and she was the only person at the office
- 9/3/15 - Linda passed the training
- Some time after training I observed Linda taking off a pallet load off of a truck, I watch [sic] and congratulated her for doing so

- 6/10 I asked people individually how deliveries were handled and how often Linda uses the forklift; 1-3 times in the time since she was trained were the answers I received. Linda calls the grounds crew to come back to facilities when deliveries arrive to use the forklift.

Dkt. No. 68-14. Adams was not given a deadline for obtaining the sticker clings, and she had provided updates of the progress to Fox throughout the month of May, even while she was on vacation and on FMLA leave. When Adams returned to work, she completed the project within three days of her return from being absent for over two weeks.

Fox and Cripps met with Adams on June 13, 2016, as planned. No one had spoken to Adams about her interactions with the student's grandmother prior to that meeting. Cripps had spoken to the grandmother, who was an employee of UI, who stated that she did not want to get Adams in trouble but confirmed that her interaction with Adams had not been entirely positive when she called to report that her granddaughter was ill and would not be at work.[12]

During the June 13, 2016 meeting, Adams also specifically informed Fox and Cripps that HR and the previous Physical Plant Director had told her not to use the forklift and not to do the training for the forklift. Notes from the meeting indicate that Adams told them that she had only used the forklift twice since being trained and that she would like more training. Dkt. No. 68-14 at 2.

At 6:22 a.m. on June 15, 2016, Fox emailed Farrell to get her input on a termination letter and to coordinate a time that Fox and Farrell could meet with Adams and inform her of her termination. At 8:30 a.m. that morning, Fox emailed Farrell that Adams had just informed her

---

[12]Cripps testified that she did not recall the exact words the grandmother used but that she conveyed that Adams had been "[n]ot very friendly," not "very nice," "a little short." Dkt. No. 71-7 at 6-7.

that she was having surgery[13] two days later and would need to take FMLA leave.[14]  Fox decided

not to terminate Adams on that day as planned because it "would not be a good choice to

terminate [Adams] immediately following receiving FMLA paperwork." Dkt. No. 71-7 at 13

(Cripps deposition testimony).

Adams returned from her FMLA leave on September 9, 2016.  During her absence,

changes had been made to the Facilities Department, which Fox described as follows in an email

to Cripps sent in anticipation of Adams' return to work:

- We have torn-down and rebuilt the front desk to a different location in order to see all UPS/FedEx delivery trucks
- We have packed-up all the non-essential items and will no longer allow clutter in the front desk area
- We have properly disposed of about a 4-high lateral file's worth of old paperwork (attendance sheets from 1985 on for every employee for example)
- I am hiring the 1st semester student help thru handshake and setting different hours than used before
- In the absence of time cards & leave reporting duties, I will fill [Adams'] time with more administrative functions
- I will now ask the Admin desk to remain open during the "other days off" like spring & fall break

---

[13]Adams asserts that the surgery was "to repair the left foot that had been further damaged because of the injury to her right foot during her fall from the forklift in April 2016." Dkt. No. 73 at 23.  None of the exhibits cited as evidence for that assertion support it.  "DOE 136" and "DOE 135" are notes from a doctor's visit on April 19, 2016, that state that she was experiencing right foot pain that started "2 days ago" and "in the past seven days," Dkt. No. 69-10 and 69-11; they do not suggest that the pain was the result of an injury or mention a fall or a forklift.  "DOE 160" is the form Adams completed to request FMLA leave for her foot surgery; it also does not mention either a fall or a forklift; rather, it states that the condition for which she was having surgery commenced on December 9, 2015, and that six months of treatment had not led to significant improvement.  Dkt. No. 69-13.

[14]Adams' assertion of fact on this point reads:  "On June 15, 2016, Adams informed Fox of her need for this additional FMLA leave; on the same day, Fox drafted a memorandum about terminating Adams' employment."  Dkt. No. 73 at 23-24.  The way that sentence is written implies that Fox drafted the memo after she learned of the leave; the evidence cited to support it consistently supports the opposite order of events.

- Linda will report to the newly approved position called Facility Operations & Compliance Coordinator[15]
- I will be sitting down with Linda upon her return to talk about a new structure for her day so that she becomes the assistant to our entire department.

Dkt. No. 71-19. In addition to these changes and a new job description,[16] upon her return from leave Adams learned that she had a new supervisor, Jennifer Rang, who is more than ten years younger than Adams.[17] Fox informed Adams that she would not be receiving a merit raise because of the corrective action against her and that per the new job description, Adams would be required to work through school breaks, including Fall, Christmas, and Spring breaks. Adams previously had not been required to work during school breaks and had never before been denied a raise. Adams was not the only employee supervised by Fox who did not receive a merit raise due to performance in 2016. Adams found the new job description, which included an addendum that provided additional detail for each job function, to be confusing and overwhelming. Fox testified that she was not aware of any other employee who had an addendum to their job description, and no other Facilities employee's job description was changed during that time.

In a memo to Adams' personnel file dated September 20, 2016, Fox recorded the following "comments and observations with Linda Adams' return from FMLA":

---

[15]This was a new position that had been created by Fox.

[16]Adams asserts that "[t]his was the second time within a year that Adams' job description had been altered." Dkt. No. 73 at 24. This is literally true; however, the first alteration was simply to shift Adams' work hours to begin and end one hour earlier, which was done at Adams' suggestion.

[17]Adams asserts that "Rang only supervised Adams," Dkt. No. 73 at 24, but the evidence she cites does not support that assertion.

Prior to Linda's return on 9/9/16, Jennifer Rang and I met to determine the job function changes that occurred for the position and revised the job description accordingly:

- Web time entry transition is complete; Linda will no longer need to perform the functions of individually adding up time sheets & tracking paid time off.
- Student labor was scheduled to give almost 40 hour/week coverage
- Linda now has more time & student back-up to begin performing higher-level administrative functions.

The revised job description included an addendum:

- More detail about each of the job function in the job description to provide more clarity of what we see her new responsibilities to be. These are not meant to be an exhaustive list but only examples.
- List of changes made to the job description so it was very clear what was different.
- List of the student worker primary responsibilities so it was clear about how the students would assist.

Upon Linda's return on 9/9/16 I welcomed her in the morning and she went into a diatribe about how much pain that she was in. She did provide a doctor's release in my inbox which I forwarded to HR. There were no restrictions to the release. In anticipation of her having some mobility issues, we made great effort to have the students cover the tasks that required walking around (accepting packages, for example).

That afternoon, Jennifer and I sat with Linda. We asked how her day went. She at first started talking about needing a separate bin to collect utility invoices and then complained that the light above her desk was giving her glare. I transitioned the meeting to get down to the purpose:

- I let her know that Jennifer would now be her supervisor. Jennifer took over the discussion explaining there was a new job description because of her job changes.
- Jennifer went through the points of the job description and the fact she now had more student coverage so that she could take on more administrative responsibilities.
- Jennifer explained the students would report to Jennifer, however, Linda being the expert in the role would train and coach them. There needed to be collaboration between Linda and each student to make certain the work orders were being handled efficiently and completely.

- Jennifer also touched on the point that Linda's role is proactive, she is to initiate conversation with each director and offer assistance—ask if they needed help with anything.
- We asked if Linda had any questions, she asked a few questions which seemed based around making sure she would have adequate training for her new tasks. We assured her that she would.
- Linda asked to have the weekend to read the job description before signing, we agreed to continue the conversation on Monday.

On Monday 9/12/16 we again sat with Linda to ask what questions she [sic] about the job description. She appeared to not have read it. The meeting consisted of Linda reading every item and asking more questions about whether she would have adequate training or not for each item. We assured her that she would and she signed the document agreeing to the job description.

- I don't recall who initiated the next topic, but Linda was very concerned about needing to leave the front desk unattended to accept a delivery because a student was 15 minutes late for their shift. She asked Jennifer how she should handle that in the future. Jennifer explained the ideal situation is to have the desk attended, in circumstances where she needs to leave—she needs to use her judgment on how to handle the situation. Linda wanted to pin Jennifer down to whether she should take the phone with her, whether she should put out a note which said she would be back in a few minutes and how many minutes is acceptable to be gone with or without a note. We reiterated someone with her experience should be able to use her judgment on when it was appropriate to leave the desk unattended.

Dkt. No. 71-20.

On September 14, 2016, just a few days after Adams' return from FMLA leave, Cripps, Rang, and Fox met to discuss Adams' performance. Rang testified that the purpose of the meeting was to "clarify expectations and how we were to work with Linda, as we noticed things that were not where we wanted them to be" and "to discern between what should be reasonable to expect versus what is unreasonable to expect." Dkt. No. 71-8 at 28-30. Although she had only supervised Adams for a few days, Rang had noticed "there were certain things that were already becoming apparent that [Rang] wanted guidance on." *Id.* at 31. Specifically, Rang "found that there were often times that there were misunderstandings and uncertainty about

directions and how to do things." *Id.* at 33. Fox's handwritten notes from the meeting contain the following: "cya game check for every detail is right down to minute detail." Dkt. No. 70-9. The notes further set out that following points to be covered in a "counseling session" with Adams:

- asked a lot of questions, clear you want to do it right, you've been here long enough to be able to be self-sufficient. Should possess the mindset w/ little direction.
- Set expectations about our reaction time
- watch & work more independently
- immediately push want improvement immediately and will touch base in 1 week
- verbal & another doc in file

*Id.* In an email to Farrell, Cripps, and Rang, Fox noted that Rang's "greatest concern was the extreme amount of questions that Linda was asking. Linda was asking questions over every step rather than thinking on her own to figure out a task. There is an expectation that someone with 14 years of experience in this job would be able to work independently and use good judgment to complete a task." Dkt. No. 68-15 at 2. Indeed, Adams testified that Rang told Adams that she "needed to quit asking questions about my new job description and new procedures that they wanted me to do." Dkt. No. 70-19 at 21.

On September 19, 2016, Fox and Rang met with Adams to discuss further concerns with her performance. Both had observed that Adams had closed the front desk blinds and appeared to speak to others only when absolutely necessary. In addition, Adams had failed to promptly process an invoice, which had resulted in a 62-cent late fee, which Adams successfully had reversed. It was also reported to Fox that Adams was not properly monitoring the work order system.

On September 23, 2016, Facilities Engineer David Statler emailed Fox to about a "conversation this morning with Linda." Statler reported that "Shortly after 8:00 a.m. she came

in to ask me if Trane was going to check in the key for Lilly/Martin that they had checked out last week for the weekend. She said she didn't have a name for the person that had checked it out. A few minutes later, she said it was back, but had not been checked in. My assumption is that it was deposited back into the drop box." Dkt. No. 68-16. Adams had not been working on the day the key had been checked out; another employee, Roberta Thompson, who was covering for Adams during her FMLA leave, had checked out the key to Trane on Thursday, September 8, 2016, "through the weekend." However, as of September 23, 2016, the key had not been logged back in on the key log. Neither Rang nor Fox asked Adams, Trane, Statler, or Thompson why the key had not been logged back in. Although Fox testified that "[t]here was weeks that went between when the key was missing," Dkt. No. 71-3 at 20-21, in fact there were eleven days between when the log indicated the key should have been returned (Monday, September 12, after the "weekend" for which it was checked out) and the date of Statler's email reporting that it had not been logged back in.

        Adams testified as follows regarding the key incident:

Q: Do you remember an incident involving keys and a key log toward the end of your employment with the university?
A: I remember it being brought up in Pam Fox's deposition.
Q: Do you have any independent recollection of that?
A: I don't have anything concrete.· I just know the policy that I usually follow.
Q: Do you recall talking with Dave Statler about a key that had been checked out by a trained[18] employee?
A: If something doesn't come back right away, I will go to the supervisor and ask them about it.
Q: So do you recall having a conversation with Dave Statler about a key that had been checked out by a [Trane] employee?
A: I think our conversation, the one I had was asking where the key was, and he probably, from what I recall, told me that they were going to need it for a longer period of time.

_____

[18]Presumably this is an error in the transcript and "trained" should be "Trane."

40

Q: Do you remember anything else about your conversation with Dave Statler about that key?

A: I remember looking through the thing, the key box, and then it was not in there. So I don't know what time he told me it was going to be back. But apparently, I must have thought it should have been back then. And I went and asked him about the key. I later found the key in the drawer, which means nobody signed it in. So I have no idea when the key came back.

Q: Where was it returned?

A: I found it in the key drawer.

Q: What is "the key drawer"?

A: It's a drawer that we keep the master keys in.

Q: Is it locked?

A: Myself and the students and all the directors have a key to that. And it stays locked.

Q: Is that the drawer where people drop their keys when they are done with them?

A: No.

Q: Okay. Do you know how it got there?

A: No.

Dkt. No. 70-19 at 72-73.[19]

On the morning of September 26, 2016, Adams' employment was terminated. The decision to terminate her at that time was made by Fox and Rang. Rang, who had only supervised Adams for two weeks, did not review Adams' personnel file or speak with Fox about Adams' past performance prior to deciding that she should be terminated. Rang believed she had sufficient information from her own observations to make the decision; Adams "did not seem to be teachable"; and she "did not do the things that we had asked her to do." Dkt. No. 71-8 at 10. When asked for specific examples during her deposition, Rang testified that Adams "did not follow up with the directors as we asked her to do for administrative support." *Id.* Rang testified

---

[19]Adams summarizes this testimony as the following factual assertion: "If Fox or Rang had spoken to Adams, she would have said that she remembered speaking to Statler about the key, and he told her 'they were going to need it for a longer period of time.' She 'later found the key in the drawer,' so 'nobody signed it in;' and Adams was not there when it was returned." Dkt. No. 73 at 27 (citations omitted). This reading of Adams' testimony fails to recognize her expressed uncertainty and lack of specific recollection.

that Adams was supposed to reach out to the directors at least twice a week to ask if there was anything she could assist them with; when Rang inquired of the directors, she found that one director had not been asked at all and two had only been asked once. The addendum to Adams' job description required Adams to "[p]roactively seek to offer assistance and check with directors on a regular basis," but did not specify how often. *Id.* at 40. As another example of Adams' failure to perform her job duties, Rang testified that Adams failed to populate a Google Sheets spreadsheet within one business day because Rang believed it to be "a very simple task" that should have taken "very little time to do." *Id.* at 12. Rang based this on her belief that "[i]t was a reasonable expectation that someone in an administrative assistant position should be able to take an Excel document and copy and paste the information into those sheets." *Id.* at 13. Finally, Rang testified about an incident in which Adams failed to catch the fact that a student worker had failed to enter a work order ticket while Adams was at lunch; the mistake was discovered an hour or so later by student workers who came to work that afternoon. *Id.* at 21-22. When asked at her deposition what the "trigger" for deciding to terminate Adams, Fox testified that it was Adams' failure to "follow the policy of master keys" and to "make sure that all master keys were logged back into our key box." Dkt. No. 71-3 at 6-7. Other "triggers" included "communication with the other directors," and "setting expectations with our customers." *Id.* at 19.

Fox's memo regarding regarding Adams' termination reads as follows:

Linda was terminated today as of 8:15a. In the meeting, Jennifer Rang and I explained to her we were very clear about our expectations and she has not been meeting them. She asked what she has not been doing. Jennifer replied with some examples. She stated that I have always had an issue with her from the very beginning. She further claimed that I had her personal items already boxed up for her and alluded that was in anticipation of her firing (her personal items were boxed so that we could reconfigure the admin front desk).

42

After the meeting, she immediately placed a phone call from her personal cell. When the caller returned her call, I overheard her say "they just terminated me so go ahead and place that phone call".  Linda spent about 45 minutes packing up her belongings and entering her time into webtime entry; Jennifer and I stood at the front desk to handle visitors and watch Linda pack her items.

Today she brought a medical scooter to work, once she was terminated she used the scooter to support her leg as she packed or went in/out of the facilities building and to her car.  This is the first time that I have seen this device, up to now she was walking on both feet without assistance.

Jennifer and/or I watched all the items that were packed.  I quickly went through the papers to make sure there were no work-related items.  They were personal papers such as schoolwork.

I anticipate her reaching out to HR.

Dkt. No. 70-1.

UI hired Lori Roehling to replace Adams.  Roehling is more than ten years younger than Adams and has no disability of which UI is aware.  Roehling had not previously worked for UI and had fewer years of experience as an administrative assistant than Adams.

## IV. DISCUSSION

Adams asserts claims against UI for age, sex, and disability discrimination; violation of the Family Medical Leave Act ("FMLA"); and retaliation for complaining about discrimination and exercising her rights under the FMLA.  UI moves for summary judgment on all claims.

As an initial matter, Adams suggests that UI argues that Adams must satisfy the *McDonnell Douglas* burden-shifting method in order to survive summary judgment.  This not an accurate reading of UI's brief, which correctly recognizes that the *McDonnell Douglas* framework is only one method of surviving summary judgment in an employment discrimination case.  *See Wrolstad v. CUNA Mutual Ins. Society*, 911 F.3d 450, 454 (7th Cir. 2018) (recognizing that both methods viable); *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216,

224 (7th Cir. 2017) (reinforcing that *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), "did not alter the burden-shifting framework created by *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." (citation omitted)).

## A. Sex, Age, and Disability Discrimination

Adams asserts claims for sex discrimination under Title VII of the Civil Rights Act of 1964, age discrimination under the Age Discrimination in Employment Act ("ADEA"), and disability discrimination under the Americans with Disabilities Act of 1990 ("ADA"). Because Adams argues that her claims survive using either the *McDonnell Douglas* framework or viewing the evidence as a whole, the Court will address both alternatives, as UI did in its brief.

### 1. Burden-Shifting Framework

Each of Adams' discrimination claims is examined the same way under the *McDonnell Douglas* framework:

> This familiar framework requires the plaintiff to carry the burden of production on a four-part prima facie case. The plaintiff must first show that (1) [s]he is a member of a protected class; (2) [s]he performed [her] job to [her] employer's expectations; (3) [s]he suffered an adverse employment action; and (4) one or more similarly situated individuals outside [the] protected class received better treatment. If the plaintiff makes this prima facie showing, the burden shifts to the employer to come forward with a legitimate, nondiscriminatory reason for the challenged employment action. If the employer does this, then the burden shifts back to the plaintiff to produce evidence establishing a genuine dispute of fact about whether the employer's reason was a pretext for discrimination. "Pretext" is more than a mere mistake; it "means a lie"—a "phony reason" for the employment action.

*Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 500 (7th Cir. 2017) (internal quotation marks and citations omitted). UI does not dispute that Adams satisfies the first and

third prongs; she is a member of the relevant protected classes and she suffered an adverse

employment action when she was terminated.[20]

With regard to the fourth prong, the Court agrees with UI that Adams has failed to satisfy

her burden of demonstrating that a similarly situated individual outside of each of the protected

classes was treated more favorably than Adams was.[21]  "'[A]n employee is similarly situated to a

---

[20]While Adams argues that she was "effectively demoted" by the changes to her job
description in September 2016, she does not argue that those changes constitute an adverse
employment action for purposes of her discrimination claims.  *See* Dkt. No. 73 at 24 n.16
(acknowledging that all alleged "adverse actions" other than termination "are inapplicable,
except as relevant background information").

[21]UI argues that Adams must prove that she was replaced by someone outside of the
relevant protected class or, in the case of the ADEA, that she was replaced by someone
substantially younger.  There is conflicting Seventh Circuit precedent on this issue.  In *O'Connor
v. Consolidated Coin Caterers Corp.*, 517 U.S. 308 (1996), the Supreme Court rejected the
notion that being replaced by a member outside of the protected class was a proper element of
the *McDonnell Douglas* prima facie case in an ADEA case because the ADEA does not prohibit
discrimination based on membership in a protected class—that is, being over age 40—but rather
prohibits discrimination based on age, and "the fact that a replacement is substantially younger
than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the
plaintiff was replaced by someone outside the protected class."  *Id.* at 313.  As Adams correctly
notes, in *Leffel v. Valley Financial Services*, 113 F.3d 787, 793 (7th Cir. 1997), the Seventh
Circuit stated, "Following *O'Connor*'s lead, we have disavowed prior cases from this circuit
suggesting that a Title VII plaintiff must show that she was replaced by someone of a different
race, sex, and so on.  We emphasized that although that kind of proof 'may help to raise an
inference of discrimination,' it is not required to make out a prima facie case, so long as there is
some evidence from which one can infer that the employer took adverse action against the
plaintiff on the basis of a statutorily proscribed criterion."  *Id.* (quoting *Carson v. Bethlehem
Steel Corp.,* 82 F.3d 157, 159 (7th Cir. 1996) (per curiam) and citing *Wallace v. SMC
Pneumatics, Inc.,* 103 F.3d 1394, 1397-98 (7th Cir. 1997)).   Later cases seem to contradict this
holding.  *See Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 321-22
(7th Cir. 2003), *as amended* (May 22, 2003) ("To establish a *prima facie* case, a plaintiff must
demonstrate that he . . . was replaced by a similarly situated individual outside the protected
class" but "[a]n ADEA plaintiff who shows that someone 'substantially younger' was retained
instead of the plaintiff need not prove that the replacement is outside the protected class.");
*Horwitz v. Bd. of Educ. of Avoca Sch. Dist. No. 37*, 260 F.3d 602, 610 (7th Cir. 2001) ("The
Supreme Court has clarified that an ADEA plaintiff who shows that he was replaced by someone
substantially younger need not prove that the replacement is outside the protected class.")
(quoting *Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389, 394 (7th Cir. 1998)).  For

plaintiff if the two employees deal with the same supervisor, are subject to the same standards, and have engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their employer's treatment of them.'" *Barbera v. Pearson Educ., Inc.*, 906 F.3d 621, 629 (7th Cir. 2018) (quoting *Lauth v. Covance, Inc.*, 863 F.3d 708, 716 (7th Cir. 2017)). "'Similarly situated employees must be directly comparable to the plaintiff in all material respects, yet this is a flexible inquiry with no magic formula.'" *Id.* (quoting *Khowaja v. Sessions*, 893 F.3d 1010, 1015 (7th Cir. 2018)). In presenting a similarly situated employee, "the comparator must be similar enough to eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel, so as to isolate the critical independent variable: complaints about discrimination." *Abrego v. Wilkie*, 907 F.3d 1004, 1013-14 (7th Cir. 2018) (citations and internal quotations omitted). "'[I]n order to show that a coworker is similarly situated to a terminated employee, the employee must show that the other coworker had a comparable set of failings.'" *Id.* (quoting *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006)). "Whether a comparator is similarly situated is usually a question for the fact-finder, and summary judgment is appropriate only when no reasonable fact-finder could find that plaintiffs have met their burden on the issue." *Barbera*, 906 F.3d at 629 (citation omitted).

The evidence Adams points to with regard to comparators is as follows.

---

purposes of this ruling, because it does not change the outcome, the Court will assume that Adams is correct that she can succeed under the *McDonnell Douglas* framework on her sex discrimination claim even though she was replaced by a woman.

First, the fact section of Adams' brief contains a section entitled "Other UI employees who made mistakes were not disciplined," Dkt. No. 73 at 29, in which Adams lists several incidents involving other employees. The Court will examine each in turn.

First, Adams states:

> Adams was aware, for example, that Chuck Boyce did not clock out while he used a university vehicle to run personal errands (DOE 72 at ADAMS29); and Boyce repeatedly hid packages that were supposed to be delivered in the UPS room. (DOE 217 153:14-153:22, 156:23-157:20). Adams reported these incidents[22] to Boyce's director. *Id.* Boyce was not disciplined or terminated for these incidents.

*Id.* However, Adams cites no evidence that Boyce was not disciplined, and her deposition testimony is that he was not disciplined to Adams' knowledge, and "I think he would have told me if he had been." Dkt. No. 70-19 at 39. In addition, Adams testified that Boyce's supervisor was Bill Nolan and that Adams does not know if Fox was aware of these incidents. Next, Adams states:

> Other UI employees in the Physical Plant admitted making mistakes and forgetting to complete projects, including Dusty Bodart and John Leck, but no corrective actions were taken against these employees and they were not terminated. (DOE 217 152:16-156:11).

Dkt. No. 73 at 29. This assertion is far too vague to be useful to Adams, as is the testimony to which she cites. Adams next asserts:

> Adams was also aware that another employee, Bill Nolan, frequently made mistakes, including failing to complete a setup correctly. (DOE 217 153:6-153:13). Adams personally received phone calls related to these complaints about Nolan's improper setups. (DOE 217 158:3-158:17). No discipline was assessed against Nolan for these mistakes, and his employment was not terminated.

---

[22]Adams points to no evidence that Adams reported Boyce's failure to clock out to anyone or that anyone but Adams was aware of it.

*Id.* at 29-30.  Again, this allegation is too vague; the Court has no idea what "failing to complete a setup correctly" means or how Nolan's mistakes compared to Adams'.  In addition, Adams cites no evidence for her assertion that Nolan was not disciplined for his mistakes, and, indeed, Adams' own deposition testimony suggests that Fox had conversations with Nolan in which she expressed her displeasure to him.  *See* Dkt. No. 70-19 at 44.  Next, Adams asserts:

> In addition, David Statler failed to submit a utilities invoice to Adams until right before it was due, resulting in UI being assessed a late fee. (DOE 187; DOE 188; DOE 217 58:1-63:5;[23] DOE 97).  Even though Statler was the cause of the late fee, he was never held accountable for this mistake.  (DOE 188).  Adams was disciplined for this incident, even though it only involved $0.62, and Adams got the $0.62 late fee reversed.  (DOE 188).  Statler also caused Adams significant confusion by changing account codes on the billing spreadsheets without telling Adams, yet he again was not held accountable for these mistakes.  (DOE 190; DOE 217 223:11-223:18).

Dkt. No. 73 at 30.  Adams cites no evidence that supports her assertion that Statler "was the cause of the late fee" or that Fox was aware of any failure by Statler with regard to the invoice.  As to the confusion Adams asserts was caused by Statler, the only evidence she cites in support for that assertion is her testimony that "Dave Statler was changing codes on a constant basis, so I don't know if he would have given me the right code or if there was a change on the code, whether I would have received it.  Dave Statler was to check the codes," Dkt. No. 70-19 at 65, and a handwritten note that reads "David is not keeping me up to date on account # change overs."  Dkt. No. 70-12.  Again, this is far too vague to permit a comparison between this alleged mistake by Statler and the mistakes for which Adams was disciplined.  In addition, Adams points

---

[23]To the extent that this deposition testimony is included in the record, it is not related to this issue.

to no evidence that Statler's supervisor was aware of this issue with codes and no evidence to support her assertion that he was not "held accountable."  Finally, Adams asserts:

> Finally, UI concluded that one UI employee engaged in "inappropriate behavior" with the housekeepers, yet UI provided no documentation that he had been terminated or disciplined for this behavior.  (DOE 241 at UIndy_Adams1841).

Dkt. No. 73 at 30.  Adams provides no information regarding the employee in question or what the alleged inappropriate behavior was; nor does Adams explain why any discipline given to that employee for "inappropriate behavior" should have been produced by UI in discovery.  In any event, the incident occurred in 2013, prior to the date the decisionmakers in this case were hired, and therefore it could not constitute evidence that the relevant decisionmakers treated the other employee (who, given his name, appears to be male, but who may or may not be disabled and/or younger than Adams) more favorably than Adams.

Adams has simply failed to provide sufficient evidence that any of the employees she pointed to "(1) 'dealt with the same supervisor,' (2) 'were subject to the same standards,' and (3) 'engaged in similar conduct' of comparable seriousness" such that they were "similar enough to [Adams to] permit a reasonable inference of discrimination."  *Coleman v. Donahoe*, 667 F.3d 835, 852 (7th Cir. 2012) (quoting *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008)).  She provides only incomplete and/or unsupported information about each alleged comparator and his alleged mistakes or misdeeds that is simply not sufficient to permit the Court to make the requisite comparisons.

Adams also argues in the section of her brief entitled "Similarly situated employees outside the protected class were treated more favorably than Adams" that "[o]verall, Fox treated male employees at the Physical Plant significantly better than Adams.  Fox was more cordial and friendly with younger, male employees."  Dkt. No. 73 at 34.   The evidence cited by Adams for

this assertion is Adams' testimony that when Fox interacted with the directors in the department, all of whom were male, she "thought [Fox] appeared as if she was being flirtatious, joking around. If they messed up on something, it seemed to be a giddy'ish or a laugh or her commenting on she messed up on something too." Dkt. No. 70-19 at 58. Title VII, the ADA, and the ADEA do not protect against this type of disparate treatment, however. Under the fourth prong of the *McDonnell Douglas* framework, the question is whether any similarly situated employees outside of the protected class were treated more favorably than the plaintiff with regard to the types of performance issues for which Adams was disciplined, not whether the decisionmaker was more inclined to socialize with them. *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 940 (7th Cir. 2003) ("In disciplinary situations, we have further interpreted this part of the test as requiring a showing that two employees dealt with the same supervisor, were subject to the same workplace rules, and engaged in similar conduct, but nonetheless received disparate treatment for no apparent legitimate reason."); *cf. Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 694 (7th Cir. 2006) ("Ms. Merillat contends that Wiland preferred to work with members of his social group and therefore chose a younger male colleague over Ms. Merillat. In support of this contention, Ms. Merillat points to the several occasions on which Wiland had lunch, drinks or dinner with Wehr, while he had never done any of the same with Ms. Merillat. However, in this context, socializing with someone who is not a member of a protected class does not demonstrate bias against those who are in a protected class.").

Adams further asserts that "Fox also spent time explaining their goals and her expectations with the men. In contrast, Fox never worked with Adams and never made her expectations clear to Adams." Dkt. No. 73 at 34. However, "the men" in question were all directors, while Adams was an administrative assistant, which means that they were not similarly

50

situated with regard to the amount of direction and goal-setting that might be expected from Fox as she worked to overhaul the department.[24]

Finally, Adams asserts that Rang, Adams' "much younger, non-disabled" supervisor, received more favorable treatment that Adams did because she was not held responsible for failing to properly train Adams and was not blamed for the incident in which the work order was delayed because a student failed to process it, even though Rang was responsible for supervising the student workers. But Adams was never disciplined for failing to train someone, and Adams points to no evidence that Fox, Rang's supervisor, felt that Rang had failed to train Adams in any respect. Adams also points to no evidence that it was Rang's responsibility to monitor the work order system, so it is unclear why Rang would be disciplined for failing to do so. With regard to Rang, Adams has failed to "to eliminate other possible explanatory variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable—discriminatory animus," *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 723 (7th Cir. 2018) (citation and internal quotation marks omitted), and therefore has failed to demonstrate that Rang was similarly situated to her.

Because Adams has not satisfied the fourth prong of the *McDonnell Douglas* framework, that path to avoiding summary judgment is not available to her.[25]

_____

[24]Adams also states that "Fox never investigated Adams' complaints about Leck's harassment of her and thus never took her complaints seriously." Dkt. No. 73 at 34. Putting aside the lack of evidence for this claim, absent evidence that Fox treated similar complaints by employees outside of the protected class more seriously, that assertion is not relevant to the fourth prong

[25]In light of this finding, the Court need not examine the remainder of the *McDonnell Douglas* framework. However, the Court notes that its discussion below of Adams' failure to demonstrate pretext applies equally to Adams' burden to demonstrate pretext in the context of that framework.

51

## 2. Evidence as a Whole

In order to determine whether Adams' discrimination claims are subject to summary judgment, the Court must examine the properly supported evidence pointed to by Adams to determine whether, viewed as a whole, it is "sufficient . . . to support a jury verdict of intentional discrimination." *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 883 (7th Cir. 2018) (citation omitted). "Such evidence may include (1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Monroe v. Indiana Dep't of Transp.*, 871 F.3d 495, 504 (7th Cir. 2017).

### *a. Pretext*

The bulk of Adams' brief with regard to her discrimination claims is devoted to her argument that UI's proffered reasons for terminating her were pretextual. Adams argues that "because [UI's] expectations were unreasonable and inadequately communicated to Adams; because it is incredible that Adams could suddenly turn into a wholly incompetent employee after 16 years of exemplary performance; and UI's stated reasons for terminating Adams were dubious, a reasonable jury could conclude UI's termination of Adams was pretextual." Dkt. No. 73 at 35. However, an examination of the evidence Adams points to makes it clear that the inferences Adams asks the Court to draw and the conclusion she asks the Court to reach are simply not reasonable.

First, Adams argues:

> On September 14, 2016, twelve days before terminating Adams' employment, Fox wrote about Adams that it was a "cya game" and noted to "check for every detail . . . right down to minute detail." Fox admitted she was looking for "improvement immediately" and would "touch base in 1 week verbal & another doc in file." Similarly, immediately after issuing a written warning, Fox told Farrell that she had tasks ready for Adams on her return from vacation, and "[a]s soon as any of these [tasks] fall short, a final written warning will be issued." These are direct admissions that Fox was never looking for improvement from Adams but was intending to get rid of Adams based on any mistake, and Fox's notes show how Fox intended to do so.

*Id.* at 35-36. The argument ignores the fact that when the "cya game"[26] comment was made, Fox had already been prepared to terminate Adams months earlier, but did not because Adams announced that she would be having surgery and requested FMLA leave, and that the quoted comment was made to Farrell after many documented attempts over many months to remedy Adams' performance issues. The quoted comments do, in fact, suggest that Fox was frustrated and wanted to terminate Adams by the time they were made, but they do not indicate that she "was *never* looking for improvement for Adams." The Court further agrees with UI that the fact that Fox was keeping detailed documentation of Adams' performance issues to "cover" herself is hardly surprising, and is certainly not evidence of a discriminatory motive, but rather an acknowledgement that Adams had already indicated that she felt she was being discriminated against and therefore her termination could result in a lawsuit in which UI would have to defend the termination decision in court.

---

[26] Presumably "cya" is shorthand for "cover your ass."

*ii. Adams' Employment History*

Next, Adams points to the fact that she had a long employment history without discipline and with consistently strong performance ratings under her long-time supervisor, Piepenbrink, as evidence that the performance issues for which she was disciplined and ultimately terminated were pretextual. The problem with that argument is that UI does not assert that "after a track record of 16 years of exemplary performance, suddenly Adams became incompetent at her job." *Id.* at 37. Rather, UI asserts that Adams failed to satisfy the expectations of a new supervisor who had been charged with overhauling the department.

> Although, in some circumstances, previous employment history may be relevant and probative in assessing performance at the time of termination, its limited utility must also be recognized. Certainly, earlier evaluations cannot, by themselves, demonstrate the adequacy of performance at the crucial time when the employment action is taken. Nor can such evaluations, standing alone, create a genuine issue of triable fact when, as here, there have been substantial alterations in the employee's responsibilities and supervision in the intervening period.

*Fortier v. Ameritech Mobile Commc'ns, Inc.*, 161 F.3d 1106, 1113 (7th Cir. 1998); *cf. Naik v. Boehringer Ingelheim Pharm., Inc.*, 627 F.3d 596, 600 (7th Cir. 2010) ("Naik's response is that he had met BIPI's legitimate expectations in the past. This, however, is irrelevant."); *Luckie v. Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004) ("However, the fact that Luckie may have met expectations in the past is irrelevant; she must show that she was meeting expectations at the time of her termination."). In this case, Piepenbrink's satisfaction with Adams' job performance does not support an inference that her later supervisors' assessment of her job performance was pretextual. Indeed, the Court agrees with UI that Adams' written response to the May 20, 2016, discipline is telling:

> In her own statement responding to the May 2016 written warning, Adams wrote, "I believe the underlying miscommunication comes from me thinking I know the

best way to do my job, and you not understanding my role and everything I do for the campus." Adams Dep. 217:19-21; Adams Dep. Ex. 18 at 1. With Adams' belief that her *supervisor* should not tell her how to do her job, it's hardly surprising Adams' performance of that particular supervisor's directions was problematic.

Dkt. No. 56 at 26.[27] The fact that Piepenbrink had no issues with Adams' performance for many years does not make the fact that her subsequent supervisors were not satisfied with her performance suspect, especially in light of the fact that Fox's changes to the department meant that there were different expectations of Adams than those to which she was accustomed.

### iii.  Failure to Follow Policies

Next, Adams argues:

Under its own Handbook, "[d]iscipline in the workplace is designed to correct or improve behavior or performance and not to punish the employee" and only should "increase[e] in severity if the problem is not corrected."  [Dkt. No. 72-10 at 2].  Only when "the employee's problem/behavior continues following the verbal and first warning," is a final warning to be issued, but here, however, Fox failed to give Adams any time to improve between her initial warning and final warning, as recommended by UI's own policy.  *Id.* at 3.  In addition, Farrell testified that she was not aware of any other UI employee who had been terminated within two weeks of a new supervisor beginning.  Evidence that UI violated its own rules and policies is further evidence of pretext.  *See, e.g.*, *Byrd v. Lakeshore Hosp.*, 30 F.3d 1380, 1383-84 (11th Cir. 1994) (employer fired a pregnant employee fired [sic] for using too much sick time, though the amount of sick time the [sic] used was within the employer's policy).

---

[27]Adams inexplicably describes this argument by UI as "UI also attempts to argue that Adams was somehow insubordinate to Fox," and argues that "[d]espite this conjecture on UI's part that Adams was being insubordinate, which she was not in the full context of the situation, Fox never accused Adams of insubordination during her employment, and indeed, Fox claims she never even saw this document. [Dkt. 55-7 ¶15].  Thus, UI's new spin on Adams' behavior is irrelevant."  Dkt. No. 73 at 41.  Adams misses the point, which is that Adams' own words in the document in question demonstrate that she was not inclined to take direction from Fox because she believed that Fox did not understand her job and Adams knew better than Fox how the job should be performed.  This provides support for Fox's allegations that Adams was not, in fact, following Fox's directions and suggests a reason why Adams had not had similar issues with her long-time supervisor Piepenbrink.

Dkt. No. 73 at 40-41.  The policy quoted by Adams, on its face, speaks of an employee's "problem/behavior" continuing; it does not suggest that an employee should be given a particular amount of time to correct her problematic behavior.  Further, Adams received her first verbal warning from Fox on September 4, 2015; she then received a written reprimand on October 1, 2015; counseling on April 29, 2016 and May 2, 2016; a written warning on May 20, 2016; and a final written warning on June 8, 2016.  She was to be terminated a week later, but was given a reprieve because she requested FMLA leave to have surgery.  Thus, she was given nine months to improve her performance before the initial decision was made to terminate her.  Once she returned to work in September, nothing in UI's policy required Fox and Rang to wait longer than they did to decide that Adams' performance had not improved and that termination was still warranted.  Thus, while "[a]n employer's departure from its own employment policies can constitute circumstantial evidence of discrimination," *Long v. Teachers' Ret. Sys. of Illinois*, 585 F.3d 344, 352-53 (7th Cir. 2009), in this case UI's use of progressive discipline did not violate its own policy.

### iv. "Secret Feedback"

Adams also asserts that "Fox submitted dozens of emails and other notes to Adams' personnel file without Adams' knowledge" and "Adams also sent various emails to Human Resources employees about Adams without Adams' knowledge."  Dkt. No. 73 at 40.  In her fact section, Adams cites to the following notes that were added to Adams' personnel file by Fox without Adams' knowledge:[28]  (1) Fox's notes from her meeting with Adams on September 4, 2015, that she emailed to Raisovich in HR and included in Adams' personnel file (Dkt. No. 70-

---

[28]Each of these notes is discussed in the Court's fact section as well.

2);[29] (2) Fox's October 5, 2015, notes from Fox's October 1st and 2nd meetings with Adams that she included in Adams' personnel file and also sent to Karn (Dkt. No. 68-6); (3) Fox's October 6, 2015, note to Adams' personnel file regarding her meeting with Battiato (Dkt. No. 70-4); (4) a note to Adams' personnel file summarizing Fox's April 29, 2016, meeting with Adams and including email exchanges between Adams and Fox about the need for a customer list (Dkt. No. 68-6); (5) a note to Adams' personnel file dated May 2, 2016, which consists of Fox's notes about the insurance certificates issue and which includes emails between Adams, Fox, and the insurance representative about the project (Dkt. No. 68-9); and (6) a September 20, 2016, memo by Fox to Adams' personnel file entitled "Comments & Observations with Linda Adams' return from FMLA" (Dkt. No. 71-20). Six is far from "dozens."[30] In any case, Adams' argument with regard to these notes to her personnel file is that "[i]f UI truly wanted Adams to improve, rather than be terminated, Fox would have informed Adams about the information being sent to Adams' personnel file and provided Adams with a fair chance to improve." Dkt. No. 73 at 40. However, with the exception of the meeting with Battiato, all of these documents relate to meetings with Adams, and Adams does not claim any of them inaccurately summarize the meetings that occurred between Fox and Adams. Therefore, these notes were simply summarizing information that Adams already had. Likewise, while Adams cites several notes

---

[29]Adams also cites "DOE 82" as one of the "multiple other emails" Fox sent to Adams' personnel file in October 2015, but that is simply an email forwarding to Karn this September 4, 2015, email to Raisovich, which was already in Adams' personnel file. Dkt. No. 68-5.

[30]Adams also includes "DOE 181" as one of the "multiple other emails" Fox sent to Adams' personnel file in October 2015; however, that document is an email Fox sent to herself entitled "Notes from meeting with Linda Adams 10/8." Dkt. No. 70-5. The document itself does not mention Adams' personnel file, and Adams offers no evidence that it was included in the file or shared with anyone else.

that Fox added to her file after her termination, she fails to explain how any of the information in those notes could have been provided to Adams prior to her termination.  *See* Dkt. Nos. 68-17, 70-7, and 72-1.[31]

In addition to the notes to Adams' personnel file, Adams also mentions "various emails" that Fox[32] sent to HR but not to Adams.  It is unclear to the Court how private communication between a supervisor and HR about an employee who is being counseled and disciplined demonstrate any nefarious purpose.  Adams points to no performance issues raised in the emails that were not otherwise expressed to her and therefore has failed to demonstrate that they support her assertion that she was denied the opportunity to improve because she was not told about her performance deficiencies.

Finally, Adams argues that "[a]t the very least, this amount of feedback amounted to surveilling Adams, which is evidence of pretext" because "surveillance 'strongly suggests the possibility of a search for a pretextual basis for discipline.'"  Dkt. No. 73 at 32 (citing *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 921 (11th Cir. 1993) (in turn quoting *B. Schlei & P. Grossman, Employment Discrimination Law*, 554 (2d ed. 1983)).  The Court disagrees that the quantity of emails and notes to file—many of which directly relate to formal meetings held with Adams to discuss her performance as the steps of progressive discipline were followed—can reasonably be characterized as supporting a finding of pretext.

---

[31]The Court has not considered the "after-acquired evidence" cited by UI because it is not relevant to the Court's resolution of the instant motion.

[32]Adams' brief states that Adams sent the emails in question, but that is clearly a scrivener's error.

*v. Illegitimate Expectations*

The main thrust of Adams' pretext argument is that UI's expectations for Adams "were illegitimate, as they were both unreasonable and inadequately communicated to Adams." Dkt. No. 73 at 36. As the Seventh Circuit has often repeated, "the court 'is not a super personnel department that second-guesses employers' business judgments.'" *Grant v. Trustees of Indiana Univ.*, 870 F.3d 562, 570 (7th Cir. 2017) (quoting *Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 895 (7th Cir. 2016)); *see also Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016) ("The federal courts are not a super-personnel department that second-guesses facially legitimate employer policies. It is not the role of the court to determine whether an employer's expectations were fair, prudent, or reasonable.") (citation omitted). "A pretext for discrimination means more than an unusual act; it means something worse than a business error; pretext means deceit used to cover one's tracks." *Kulumani v. Blue Cross Blue Shield Ass'n,* 224 F.3d 681, 684 (7th Cir. 2000) (internal citations omitted); *see also Forrester v. Rauland-Borg Corp.,* 453 F.3d 416, 418 (7th Cir. 2006) (in analyzing pretext, "the question is never whether the employer was mistaken, cruel, unethical, out of his head, or downright irrational in taking the action for the stated reason, but simply whether the stated reason *was* his reason: not a good reason, but the true reason") (cited in *Liu v. Cook Cty.*, 817 F.3d 307, 318 (7th Cir. 2016)).

> The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain the discharge. It is not the court's concern that an employer may be wrong about its employee's performance, or be too hard on its employee. Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie. To meet this burden, plaintiff must identify such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's asserted reasons that a reasonable person could find them unworthy of credence.

*Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 724 (7th Cir. 2018) (citations and internal quotations marks and brackets omitted).

This is the showing Adams attempts to make. She argues that Fox's, and later Rang's, actions were so unreasonable that a reasonable jury could conclude that they were pretextual. Specifically, she points to the following:[33]

- Fox failed to investigate the facts surrounding the key incident and, in her deposition, stated that Adams had failed to follow up for "weeks," when in fact it had only been eleven days;

- Adams was criticized for failing to complete the Google spreadsheet after she had told Fox and Rang that she lacked sufficient training on Excel and Google Sheets;[34]

---

[33]Adams argues that she "has challenged the disciplines against her as false and suspicious; thus, whether each of the disciplines against Adams was actually based on poor performance is a material fact in dispute." Dkt. No. 73 at 18 n.11. However, Adams cannot create an issue of material fact by making a generalized statement; she must point to specific evidence in the record. The Court notes that much of the evidence pointed to by Adams with regard to her discipline involves what Adams told UI at the time she was disciplined. *See, e.g.*, *Id.* at 18 ("Adams disputed the accuracy of each of these allegations."); *id.* at 19 ("Adams informed Karn of her concerns with Fox's corrective action as well as her fear of Leck . . . ."); *id.* at 22 ("Adams disagreed with and disputed the items contained in this final warning."); *id.* at 22 (discussion of June 8, 2016, meeting with Farrell). This is not the same as evidence that disputes the accuracy of the factual bases for the discipline in question; there is a subtle but important difference between "that allegation by my supervisor is false" and "I told people that that allegation by my supervisor was false." However, UI does not rely on that distinction, so the Court has assumed in making this ruling that Adams would testify under oath consistently with the statements she made to UI. In other words, to the extent that Adams points to specific statements she made to UI disputing specific factual assertions relating to her discipline, the Court has assumed that she would make those same statements under oath at trial. *Cf.* Federal Rule of Civil Procedure 56 (requiring evidence that can be "presented in a form that would be admissible in evidence").

[34]Rang testified that the particular project at issue required only copying and pasting from an Excel spreadsheet to create a google spreadsheet and that it was a "very simple task." Dkt. No. 37. Adams does not cite to any evidence that refutes that characterization; nor does she cite

60

- Adams was told to ask questions if she did not understand an assignment and then was criticized for asking too many questions;[35]

- Adams was criticized for the late utility bill payment "even though the utility bill had been provided late to Adams and although the late charge was reversed at Adams' request," Dkt. No. 73 at 38, and was only 62 cents;[36]

- Fox held Adams accountable for the sticker clings order being placed late, even though she completed the order promptly after returning from her leave;

- Fox held Adams accountable for failing to respond to the work order ticket when she returned from lunch but did not hold Rang responsible;

- Adams was not given sufficient time to "understand and adhere to" her new job description before she was terminated; and

- The requirement that Adams check in with the directors on a regular basis was not defined, yet Rang testified that Adams was terminated for failing to contact them at least twice a week.

---

any evidence that the reason she failed to complete the task was that she lacked the requisite skills to do so.

[35]Adams does not point to any evidence that refutes UI's evidence that her questions were "excessive and unnecessary." Dkt. No. 55-7 ¶ 7 (Rang Declaration); *see also id.* ¶ 6 (Adams "spent an exorbitant amount of time asking questions, instead of thinking through issues, being resourceful, and exercising good judgment and independence based on her experience"); Dkt. No. 55-7 ¶ 32 ("Adams' constant questioning of even the most basic duties of her job was also troubling and wholly inconsistent with the expectations for an experienced administrative assistant.").

[36]Adams cites no evidence that would support a finding that it was unreasonable to expect her to process the utility bill before the due date even though she received it "right before it was due."

*See* Dkt. No. 73 at 37-41.[37]  Viewing the evidence in the light most favorable to Adams, a reasonable jury could agree with Adams that some of the complaints against her were unfair; however, "[b]eing blamed unfairly is not evidence of deceit." *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 466 (7th Cir. 2014).  The Court finds that, considering the properly supported evidence pointed to by Adams, which the Court has set forth in great detail in the fact section above, and viewing it in the light most favorable to Adams, a reasonable jury could not find that the reasons given for Adams' termination were so weak, implausible, inconsistent, or contradictory "that a reasonable person could find them unworthy of credence." *Skiba*, 884 F.3d at 724; *see also Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635, 646 (7th Cir. 2013) ("Where an employer's reason for a termination is without factual basis or is completely unreasonable, that is evidence that an employer might be lying about its true motivation.").

### b.  Specific Age/Gender/Disability Animus

Finally, Adams points to several things she argues demonstrate animus toward her because of her membership in protected classes.

### i.  Disability

With regard to disability, Adams first points to Fox's comment in her June 1, 2016, email to Farrell, upon learning that Adams would be taking FMLA leave instead of returning from her vacation, that "it's been an undocumented pattern that medical issues arise when disciplinary

---

[37]Adams also points to the fact that Rang did not review her personnel file or educate herself regarding Adams' past performance, but rather decided that Adams should be terminated based upon two weeks of observing her work.  This might have been unreasonable if Rang's two weeks of observation had been the only basis for Adams' termination, but they were not.

action occurs." Dkt. No. 70-6.[38]  Specifically, Fox noted that on April 20, 2016, when Fox had "challenged [Adams] on her excuses, she replied she accidentally took too much medication and didn't know what she was saying" and on April 29, 2016, when Fox had asked Adams for a progress report, Adams had told her that she was sick and needed to go home.  *Id.*  Adams points to no evidence that any sickness she had on April 29, 2016, was related to her disability or that Fox perceived it to be; nor has she explained how being unhappy that an employee took too much medication at work (or, perhaps, being suspicious when that explanation was given by an employee as an excuse) equates with animus toward a disability.

Next, Adams points to Fox's comment in her June 6, 2016, email to Julie Cripps from the HR department that "I know she will state she's on pain killers now." Dkt. No. 70-16.  The context of that comment was Fox's query of Cripps whether "we have an issue with her working while on medication?"  *Id.*  Adams fails to acknowledge this or articulate why such a concern by a supervisor indicates animus toward disability.

Next, Adams points to Fox's handwritten to-do list dated June 7, 2016, which notes that Adams' FMLA paperwork needed to be signed; that she needed to "[s]it down w/ Linda–sign today and acknowledge no documentation that says you need to take medication. Not unable to perform her job.  Next time may be dismissal"; and "final written warning w/ Julie & give copy."

---

[38]Adams argues that "[s]ince Adams had only received discipline twice at that time, once in October, 2015 and once on May 21, 2016, it's unclear how any pattern could have developed." Dkt. No. 73 at 42 n.17.  However, this ignores that fact that in the same email Fox noted that on April 20, 2016, when Fox had "challenged [Adams] on her excuses, she replied she accidentally took too much medication and didn't know what she was saying" and on April 29, 2016, when Fox had asked Adams for a progress report, Adams had told her that she was sick and needed to go home, Dkt. No. 70-6, thereby explaining what she meant by "pattern."  Adams does not dispute that these two events occurred.

Dkt. No. 69-17.  Adams does not articulate why she believes an inference of animus can be drawn from this list; again, Fox's mention of Adams' medication is understandable given the fact that Adams had previously used the fact that she had taken too much medication as an explanation for misstating a fact to Fox.

Next, Adams points to Fox's initial inclusion of the parking space incident in her October 2015 memo.  However, the import of that incident was that Fox believed it was another example of Adams treating another employee poorly.  No inference of animus toward Adams' status as a person with disabilities can be inferred simply because the alleged unpleasant exchange happened to involve a handicapped parking spot.[39]

Next, Adams points to Fox's "insistence on Adams' training on the forklift" after Adams told her that she was taking medication and previously had been told by HR that she should not drive a forklift.  Dkt. No. 73 at 42-43.  However, given the vagueness of the information Adams says she gave Fox, the fact that Fox declined to excuse Adams from forklift training based on that information cannot reasonably be considered evidence of animus toward Adams' disability.

That leaves "Fox's comment in her September 20, 2016, memo that 'Upon Linda's return on 9/9/16 I welcomed her in the morning and she went into a diatribe about how much pain that she was in.'" Dkt. No. 71-20.  This comment certainly suggests that Fox was unhappy with Adams' complaints of pain.  However, Adams points to no evidence that disputes this characterization of what occurred that morning, and a supervisor's displeasure at a diatribe in the workplace is unsurprising.

---

[39]Adams also points to Vitangeli's treatment of her request for an accessible parking space in 2014, but that is irrelevant, as Vitangeli was not involved in the decision to terminate her.

*ii. Age and Gender*

With regard to gender animus, Adams argues only that the manner in which UI handled Adams' complaints of being bullied and harassed demonstrates animus based on gender. In the absence of any evidence that UI—and, specifically, the relevant decisionmakers—handled complaints made by men differently, no inference of animus can be drawn.

With regard to animus based on age, Adams argues that "because Adams was denied training she requested, but then was held accountable for the activities on which she sought training, this shows evidence of an animus against Adams based on her age." Dkt. No. 73 at 43. As noted above, Adams has failed to identify how any training that she requested related to any of the performance issues that led to her termination. In addition, in the absence of any evidence that younger employees were treated differently with regard to training, or any comments or other evidence to suggest that Adams was denied training because of her age, this cursory argument is without merit.

### c. Conclusion

Viewing as a whole all of the evidence pointed to by Adams as evidence of discrimination, the Court finds that there is simply not enough there to support a jury verdict of intentional discrimination based on disability, age, or sex. That is, no reasonable jury could conclude based on that evidence that sex was a motivating factor in Adams' termination or that Adams would not have been terminated if she had not been disabled or had been younger. Accordingly, UI is entitled to summary judgment on Adams' discrimination claims.

## B. Retaliation

In order to survive summary judgment on her retaliation claim, Adams "must identify evidence showing that (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between the two. *Guzman v. Brown Cty.*, 884 F.3d 633, 642 (7th Cir. 2018). Adams points to the numerous instances in which she alleges she engaged in statutorily protected activity between October 2014 and June[40] 8, 2016, and UI does not dispute that each of these constitutes statutorily protected activity. Adams points to the fact that a relatively short time period passed between her last protected activity and her termination. While more than three calendar months passed between June 8, 2016, and Adams' termination on September 26, 2016, the Court agrees with Adams that it is appropriate to consider the fact that Adams was on FMLA leave between June 17, 2016, and September 9, 2016. Also relevant is the fact that UI had planned to terminate Adams on June 15, 2016. Accordingly, the Court finds that the time between Adams' protected activity and her termination is short enough to "provide probative evidence of the required causal nexus" between that protected activity and her termination. Dkt. No. 73 at 46 (quoting *Coleman v. Donahoe*, 667 F.3d 835, 861 (7th Cir. 2012)). That, alone, is not enough, however. The Seventh Circuit has "repeatedly held that '"[s]uspicious timing alone rarely is sufficient to create a triable issue,' and on a motion for summary judgment, 'mere temporal proximity is not enough to establish a genuine issue of material fact.'" *Riley v. City of Kokomo*, 909 F.3d 182, 188-89 (7th

---

[40]In the argument section of her brief, Adams lists this meeting as occurring on July 8, 2016. Dkt. No. 73 at 38. However, in the fact section of her brief, she acknowledges that the meeting occurred on *June* 8, 2016, which is consistent with the evidence. *See* Dkt. No. 73 at 22 (citing "DOE 260," which is Dkt. No. 72-9 (Farrell notes dated 6/8/16)).

Cir. 2018) (quoting *Cole v. Illinois*, 562 F.3d 812, 816 (7th Cir. 2009) (in turn quoting *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 851 (7th Cir. 2008)). "Rather, a 'plaintiff must ordinarily present other evidence that the employer's explanation . . . was pretext for retaliation.'" *Id.* (quoting *Tibbs v. Admin. Office of the Ill. Cts.*, 860 F.3d 502, 505 (7th Cir. 2017)); *see also Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012) ("We have often invoked the general rule that temporal proximity between an employee's protected activity and an adverse employment action is rarely sufficient to show that the former caused the latter.") (citation and internal quotation marks omitted).

Adams' only argument besides suspicious timing is that "[a]s shown above, there is ample evidence for a reasonable jury to conclude that UI engaged in a campaign of retaliation against Adam since she made her complaint about Leck, requests for accommodation, and other protected activities." Dkt. No. 73 at 46. Thus, as she relies on the same arguments and evidence to support her retaliation claim that she does for her discrimination claims, her retaliation claim fails for the same reasons. Adams simply has not pointed to sufficient evidence to support a finding that she was terminated in retaliation for engaging in protected activity.

### C. Failure to Accommodate

Adams alleges that UI violated the ADA by failing to accommodate her disability when it required her to operate a forklift. UI argues that this claim is untimely because Adams did not file a charge raising it with the Equal Employment Opportunity Commission ("EEOC") within 300 days of when she alleges she was forced to complete forklift training. Adams raised a failure to accommodate claim in an EEOC charge dated February 27, 2017; 300 days prior to that date is May 3, 2016.

In response, Adams argues:

67

> Adams continued to complain about her ability to safely operate a forklift due to her inability to climb as late as June 8, 2016, during a meeting with Farrell, the head of UI's Human Resources. This was a discrete request for accommodation to UI. Farrell responded that she would follow up with Adams' podiatrist. No such follow up ever occurred; Adams was forced to continue operating the forklift; and UI never provided an accommodation before Adam's [sic] termination.

Dkt. No. 73 at 48. The evidence simply does not support this assertion, however. In her statement of facts, Adams points to DOE 227 ¶ 36 for the assertion that "Adams told Farrell that her operation of the forklift was 'not safe;' and UI said it would address 'with [her] podiatrist concerning Adams' inability to climb on forklift.'" Dkt. No. 73 at 22. That paragraph of Adams' declaration reads as follows:

> On June 8, 2016, I met with Erin Farrell, the head of Human Resources at UIndy. I told Ms. Farrell that I was concerned with my ability to safely operate the forklift, as it was difficult for me to climb up and down the forklift, and I was taking medication that may interfere with my ability to operate machinery. Ms. Farrell told me not to operate the forklift because of my medication and stated she would follow up with Ms. Fox.

Dkt. No. 71-10 ¶ 36.[41] Thus, according to Adams' own declaration, when she requested the accommodation of not operating the forklift on June 8, 2016, she was told not to operate the forklift; in other words, her request was granted. Adams points to no evidence that she operated the forklift during any of her remaining days at UI. While she argues that "forklift driving remained a duty of Adams' until her termination of employment from UI," Dkt. No. 73 at 51, she points to no evidence that Farrell's instruction not to operate the forklift was ever contradicted or that she was asked to operate the forklift after that date. Accordingly, Adams has failed to point

---

[41]Adams also points to Farrell's notes from the June 8, 2016, meeting, which include the following: "trained for forklift—not safe because not doing it frequently—will address with podiatrist concerning inability to climb on forklift." Dkt. No. 72-9.

to evidence from which a reasonable jury could conclude that she was denied a reasonable accommodation within the 300 days prior to her EEOC charge, and UI is entitled to summary judgment on Adams' failure to accommodate claim.

### D. FMLA Interference

Finally, Adams alleges that UI violated the FMLA by interfering with her substantive rights under the FMLA and by retaliating against her for exercising those rights. With regard to the former, the only dispute between the parties is whether UI denied her FMLA benefits to which she was entitled. Adams argues:

> Here, Adams returned from her FMLA leave and discovered that her responsibilities were significantly altered and reduced. She was given a totally new job description and addenda to the same. It is undisputed that Adams was the only employee whose job description changed at this time, and she was the only employee who was newly required to work over school breaks. Moreover, UI assigned Adams a new supervisor, Jennifer Rang, who only supervised Adams. Fox admitted that she had given Adams a "new structure for her day" and [Adams] was assigned to become "the assistant to our entire department." These changes were significant and a violation of the FMLA.

Dkt. No. 73 at 52. However, as UI notes,

> An employer may "refuse to restore an employee to the 'former position when restoration would confer a 'right, benefit, or position of employment' that the employee would not have been entitled to if the employee had never left the workplace.'" [*Goelzer v. Sheboygan County,Wis.,* 604 F.3d 987, 993 (7th Cir. 2010)] (quoting *Kohl's v. Beverly Enters. Wisc., In*c., 259 F.3d 799, 805 (7th Cir. 2001) (citing 29 U.S.C. § 2614(a)(3)(B)); *see also* 29 C.F.R. 825.216(a) ("An employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee has been continuously employed during the FMLA leave period."); *Barton v. Zimmer, Inc*., Case No. 1:06-CV-208-TS, 2009 WL 10692051 (N.D. Ind. July 16, 2009) (granting summary judgment on FMLA interference claim despite plaintiff's return to different position because department was undergoing changes and different project(s) would have been assigned to plaintiff regardless of FMLA leave).

Dkt. No. 56 at 31. UI has pointed to ample evidence that the changes about which Adams complains were related to Fox's plan to revamp the Physical Plant and would have occurred

regardless of Adams' FMLA leave.  Adams points to no evidence that would support a contrary

finding by a reasonable factfinder.  Nor has she pointed to any evidence that would support a

finding that she was denied a merit raise because she took FMLA leave, rather than because of

performance issues that were identified and addressed both before and after she requested FMLA

leave.

　　　　With regard to her FMLA retaliation claim, to survive summary judgment, Adams must

point to evidence from which a reasonable factfinder could conclude that "(1) [s]he engaged in

protected activity; (2) [s]he suffered an adverse employment action; and (3) there is a causal

connection between the two."  *Carter v. Chicago State Univ.*, 778 F.3d 651, 657 (7th Cir. 2015);

*see also Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018) ("Retaliation claims under

the FMLA require that: (1) the employee engaged in statutorily protected activity; (2) the

employer subjected her to an adverse action; and (3) the protected activity caused the adverse

action." (citing *Freelain v. Vill. of Oak Park*, 888 F.3d 895, 901 (7th Cir. 2018)).[42]  Adams'

arguments with regard to this claim fail for the same reasons that her other retaliation claims fail.

While Adams argues that "on top of the pretextual analysis above, the timeline is particularly

compelling" with regard to her FMLA retaliation claim, Dkt. No. 73 at 53, as discussed above,

------------------------------

　　　　[42]Adams, citing an unpublished district court case, argues that she need only prove that
her FMLA leaves were "a substantial or motivating factor" in her termination.  Dkt. No. 73 at
52-53.  While that was the law at one time, the Supreme Court held in *University of Texas
Southwestern Medical Center v. Nassar,* 570 U.S. 338 (2013), that "Title VII retaliation claims
must be proved according to traditional principles of but-for causation."  Because retaliation
claims under Title VII, the ADA, and the FMLA are all evaluated in the same manner, *see
Freelain*, 888 F.3d at 900-01, as the cases cited above demonstrate, more recent Seventh Circuit
cases apply the but-for causation standard to FMLA retaliation cases as well.

suspicious timing alone is not sufficient to support a retaliation claim.[43] Accordingly, UI is

entitled to summary judgment on both of Adams' claims under the FMLA.

## V. CONCLUSION

For the reasons set forth above, UI's motion for summary judgment (Dkt. No. 55) is

**GRANTED** in its entirety and Adams' motion to file a surreply (Dkt. No. 97) is **DENIED**.  In

light of this ruling, all other pending motions are **DENIED AS MOOT**.

SO ORDERED: 3/22/2019

Hon. William T. Lawrence, Senior Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification

---

[43]The Court notes that the timeline is not as suspicious as Adams suggests.  Fox had
identified and documented concerns about Adams' behavior beginning on September 4, 2015;
given Adams a written reprimand on October 8, 2015; and met with Adams to discuss
performance issues on April 29, 2016, May 11, 2016, and May 20, 2016.  All of this occurred
before Adams took her first FMLA leave on May 31, 2016.  Given this context, the fact that
additional disciplinary action regarding performance issues was taken shortly after Adams'
return from FMLA leave is not particularly suspicious.